STATE OF NORTH CAROLINA v. MICHAEL EDWARD PINCH

No. 43A81

(Filed 2 June 1982)

1. **Constitutional Law § 62; Criminal Law § 135.3— excusal of jurors opposed to death penalty—defendant not deprived of constitutional rights**

    The trial court properly excused eight prospective jurors for cause due to their stated opposition to the death penalty in a prosecution for first degree murder where seven jurors unequivocally stated they could not impose the death penalty under any circumstances and where the eighth juror, after some initial equivocation, stated that she did not "believe" that she could impose the death penalty regardless of the evidence. The excusal of the jurors did not deprive defendant of his constitutional rights to trial by a jury representative of a cross-section of the community or due process of law.

2. **Criminal Law §§ 102.6, 113.2— prosecutor's argument and court's instructions concerning defense of intoxication proper**

    In a prosecution for first degree murder, the district attorney correctly conveyed the substance of the law and the evidence of defendant's intoxication defense to the jury and the trial court properly instructed upon the defense.

3. **Constitutional Law § 30— no duty of State to make eyewitnesses "available" for interviews with medical experts**

    The trial court did not err in denying defendant's pretrial motion for an order directing the district attorney to make the State's eyewitnesses "available" for interviews with a medical expert who had been appointed to assist in the preparation and evaluation of an intoxication defense since nothing in our statutory discovery provisions would require *the State to compel* its witnesses to submit to any form of interview or questioning by the defense prior to trial. Further, there was nothing in the record to substantiate defendant's claim that defense counsel actually approached the potential witnesses for the stated purpose only to be rejected on account of the district attorney's prior, direct instructions to them not to cooperate.

1

**4. Criminal Law § 38; Homicide § 15— exclusion of testimony concerning intoxication defense proper**

In a prosecution for first degree murder, the trial court properly excluded questions which were not competently framed to elicit a witness's opinion about defendant's general intoxication. The court's ruling did not improperly hinder defendant's effort to present his intoxication defense, and none of the questions sought to elicit relevant information having a *direct* bearing upon *defendant's* intoxication impairment *at the time he committed the murders.*

**5. Homicide § 24.2— instructions concerning presumption of malice proper—defendant conceding guilt**

The trial court did not err in its final instructions by stating that the elements of malice and unlawfulness were implied in an intentional killing with a deadly weapon where the defendant, through his trial counsel, *conceded* his guilt of the second degree murders of the victims and admitted "the intentional killing and the malice involved in" the murders.

**6. Homicide § 20.1— introduction of photographs of victims' bodies proper**

In a prosecution for first degree murder, the trial court properly admitted into evidence ten photographs of the victims' bodies to illustrate the testimony of a forensic pathologist who had performed autopsies on the bodies. The illustrative relevancy of the photographs was not nullified by defendant's stipulation that "he killed both victims with gunshot wounds."

**7. Criminal Law § 102.1— prosecutor's argument to jury—proper**

The district attorney's remarks to the jury concerning (1) defendant's pleasure in killing, (2) what defendant must have been thinking before he shot the victims, and (3) "comparisons" between defendant and animals were either entirely warranted by the evidence or not so prejudicial that the trial court was required to take corrective action in the absence of an objection.

**8. Criminal Law § 135.4— sentencing hearing—exclusion of evidence—not prejudicial**

The trial court did not commit prejudicial error by excluding testimony about defendant's current feelings of remorse over the victims' deaths, about the circumstances of defendant's various hospitalizations for drug overdoses, and testimony concerning defendant's ability to adjust to life in prison in defendant's sentencing hearing after being convicted of two first degree murders. Some of the evidence sought to be introduced was irrelevant and the record as a whole was replete with evidence of other matters which defendant sought to introduce.

**9. Criminal Law § 135.4— sentencing phase—improper question by prosecutor—no prejudicial error**

At the sentencing phase of defendant's trial for first degree murder, the prosecutor erred in suggesting that defendant stole money in order to support his drug habit; however, as it was a single impropriety, and as the trial court promptly sustained defendant's objection to the disapproved question, the court sufficiently averted any prejudice to defendant.

10. **Criminal Law § 135.4— sentencing phase—prosecutor's argument to jury— within bounds of permissible argument**

Although the district attorney argued for capital punishment of defendant's murder convictions with vim and vigor, his zeal did not cause him to overstep the bounds of permissible argument.

11. **Criminal Law § 135.4— sentencing phase—submission of mitigating circumstances to jury—no prejudicial error**

In order for a defendant to demonstrate reversible error in the trial court's omission or restriction of a statutory or timely requested mitigating circumstance in a capital case, he must affirmatively establish three things: (1) that the particular factor was one which the jury could have reasonably deemed to have mitigating value; (2) that there was sufficient evidence of the existence of the factor; and (3) that, considering the case as a whole, the exclusion of the factor from the jury's consideration resulted in ascertainable prejudice to the defendant. Therefore, although there was evidence that defendant's I.Q. fell into the "low-normal range of intelligence," the trial court did not err in failing to submit as a mitigating factor defendant's "relatively low mentality" since one would not commonly understand low to normal intelligence to be synonymous with relatively low mentality. Further, the evidence did not support the submission of the statutory mitigating circumstance of G.S. 15A-2000(f)(2), that he committed the murders while he was "under the influence of mental or emotional disturbance."

12. **Criminal Law § 135.4— sentencing phase—submission of two killings as aggravating circumstance for one another—no double jeopardy**

In the sentencing phase of defendant's trial, the trial court's submission of each of two killings as an aggravating circumstance for the other under the "course of conduct" provision of G.S. 15A-2000(e)(11) did not violate defendant's protection against double jeopardy.

13. **Criminal Law § 135.4— sentencing phase—mitigating circumstances not specified by jury**

The statutes do not require the jury to specify in the sentencing phase of a trial which mitigating circumstances it found.

14. **Criminal Law § 135.4— sentencing phase—duty to recommend death or life imprisonment**

The trial court correctly advised the jury that it had a duty to recommend a death sentence if it found three things: (1) that one or more statutory aggravating circumstances existed; (2) that the aggravating circumstances were substantial enough to warrant the death penalty; and (3) that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. The jury was also correctly advised that it had the duty to recommend a sentence of life imprisonment if it did not find any one of those three things. G.S. 15A-2000(b) and (c).

15. **Criminal Law § 135.4— sentencing phase—submission of aggravating circumstance that murders were heinous, atrocious, or cruel**

The trial court correctly instructed the jury upon the statutory aggravating circumstance of G.S. 15A-2000(e)(9), that the murders were "especial-

ly heinous, atrocious, or cruel," where the evidence tended to show that one of the victims was shot once and then shot again at point blank range as he lay moaning on the floor, and the other killing was merciless and conscienceless in that defendant shot the victim as he begged and pleaded for his life.

**16. Criminal Law § 135.4— sentencing phase—sentence of death not disproportionate as matter of law**

In a prosecution for first degree murder, the sentence of death was not, as a matter of law, "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." G.S. 15A-2000(d)(2).

Justice MITCHELL did not participate in the consideration or decision of this case.

Justice CARLTON concurring.

Chief Justice BRANCH joins in this concurring opinion.

Justice EXUM dissenting as to sentence.

ON appeal by defendant as a matter of right from the judgments of *Walker, Judge*, entered at the 25 August 1980 Criminal Session, GUILFORD Superior Court. Defendant was charged in indictments, proper in form, with the first degree murders of Freddie Pachaco and Tommy Ausley. Upon defendant's motion, the cases were joined for trial. The jury returned verdicts of guilty and recommended the sentence of death in each case. The trial court ordered the imposition of the death penalty for both killings.

In relevant part, the evidence for the State tended to show the following. On 16 October 1979, defendant, a nineteen year old white male, was walking on Merritt Drive in Greensboro with his friend Jimmy Eanes when he happened to meet Freddie Pachaco. Defendant did not like Pachaco because he had been friendly with a girl defendant liked and had, without proper entitlement, worn the personal insignia ("colors") of a motorcycle gang on his jacket. On this occasion, defendant told Eanes that he "hated that punk" (Pachaco) and wanted to fight him right then and there. This did not occur, however, because Pachaco was conciliatory and offered defendant some marijuana. The group then went to a trailer where they smoked marijuana and drank beer. Sometime later, Pachaco asked defendant outright whether he was "after" him. Defendant replied that he was not and further said that "if [he]

was going to kick [Pachaco's] ass, [he] would have already done it."

On the following day starting at about noon, several people began to congregate at the trailer, where defendant apparently lived, to drink beer and listen to music. The merrymakers included Jimmy Eanes, Shawn Feeney, Keith Way, Billy Stanley and Leslie Hearl (who later married Stanley before trial). Pachaco and his friend Tommy Ausley also unexpectedly joined the party and bought two cases of beer. Everybody was calm and pleasant and seemed to be having a good time. However, defendant told several of his friends during the course of the party that he disliked, or didn't have "much use for", Pachaco and said he would like to kill him. Later in the evening, defendant took Feeney's shotgun and fired it at the clothesline three times. A deputy sheriff came to the trailer to investigate the disturbance, but he soon departed after talking to defendant.

Upon defendant's suggestion, everyone decided to leave the trailer and go to the Stroker Motorcycle Clubhouse, which was located in some woods near Wendover Avenue in Greensboro. Defendant had reasoned that they could make as much noise as they wanted to out there and get more beer besides. [It was approximately 10:00 p.m.] While everyone prepared to move, defendant quickly slipped out to a nearby trailer where he borrowed a shotgun. He returned with the gun and told Eanes to ride with Pachaco and Ausley to make sure they got to the clubhouse. The entire party then proceeded to the rendezvous in various vehicles, caravan style. En route, defendant retained the shotgun and told his companions that he was going to kill Pachaco and Ausley.

When the group arrived at the clubhouse, defendant opened the door while he continued to hold the shotgun. Once inside, the members of the party played games, drank beer and listened to music. Billy Stanley and Leslie Hearl left the company and went into an adjacent room to have sexual intercourse. While everyone else engaged in these various recreational activities, defendant sat silently behind the bar with the shotgun in his lap. Sometime later, defendant gave his knife to Eanes and instructed him to cut Pachaco's jugular vein and promised to back him up with the shotgun. Eanes attacked Pachaco but only succeeded in cutting

him on the throat. Pachaco became emotional at this point but did not fight back. Ausley attempted to help Pachaco and was confronted by Eanes who threw a chair at him. At this point in the evening's events, the testimony of the eyewitnesses differed somewhat. Nevertheless, the overall weight of that testimony combined with the evidence of defendant's own pre-trial statements to law officers tended to show the following occurrences.

Immediately after the throat-slashing incident between Eanes and Pachaco, defendant raised the shotgun and pointed it at Pachaco. Pachaco told defendant, "I will go down laughing." Without saying a word, defendant shot him in the chest. Defendant then turned toward Ausley, whom he had never seen before that day. Ausley pleaded with defendant and said, "don't shoot me," "[n]o, not me." Defendant shot him anyway. Pachaco was still moaning. Defendant walked over to where he lay helpless on the floor and shot him again at point blank range just below the heart. Pachaco and Ausley died from the gunshot wounds. During the shootings, defendant had "a sort of grin" on his face.

Defendant, apparently with a full realization of what he had just done, walked outside to the porch of the clubhouse and told Feeney and Way that he had "blown away" two dudes. He then directed everyone to help him dispose of the bodies. The bodies were placed in an automobile which Eanes drove to Causey Street and abandoned in a ditch. Defendant did not return to his residence; instead, he went home with Stanley and Hearl. On the way, he told Stanley that he had killed Pachaco and Ausley because he "didn't have any use for people like that." Defendant was not upset and seemed to have no regrets about the murders. He went to sleep. The next day, Stanley and Hearl returned to the clubhouse at defendant's behest and cleaned up the blood on the floor. Another member of the Stroker motorcycle gang painted the steps to conceal bloodstains.

The bloody car and bodies of Pachaco and Ausley were discovered in the early morning hours of 19 October 1979. Defendant took a bus to California where he was subsequently arrested on 28 January 1980. Defendant waived extradition on 4 February 1980 and was picked up by two officers of the Greensboro Police Department two days later. During the flight back to North

Carolina, defendant made a full confession to the murders. [He was advised of his constitutional rights and executed the required waiver form.]

Defendant presented no independent evidence during the guilt determination phase of the proceedings. The defense did, however, elicit evidence during cross-examination of prosecution witnesses tending to show that defendant was drunk when the killings occurred.

The jury found defendant guilty of two counts of first-degree murder. The State relied on its evidence presented during the guilt phase of the trial and did not offer additional evidence during the sentencing hearing. The State did, however, argue that the murders were especially heinous because defendant committed them for sport and amusement. In addition, the State contended that the killing of the eighteen-year-old Ausley was particularly despicable because defendant had shot him in cold blood as he begged and pleaded for his life. On the other hand, defendant offered much evidence in mitigation of his criminal acts, including the following facts: his youth; the divorce of his parents during his childhood; his chronic drug and alcohol abuse since the age of twelve; his leaving home at the age of thirteen (from that time on, he had lived on his own); his low intelligence; his psychological problems of depression, conflicts in relationships and poor judgment; and his feelings of remorse over the killing of Ausley. In its instructions upon the sentencing phase of the case, the court submitted two aggravating circumstances for the jury's consideration: (1) the murders were especially heinous, atrocious or cruel, G.S. 15A-2000(e)(9); and (2) each murder was part of a course of conduct in which defendant committed a crime of violence against another person, G.S. 15A-2000(e)(11). The court also submitted ten mitigating circumstances to the jury. The jury subsequently found one or more of the mitigating factors but also unanimously found them to be outweighed by the foregoing aggravating circumstances beyond a reasonable doubt. The jury therefore recommended imposition of the death penalty for both murders, and the court so ordered.

Additional facts, which become relevant to defendant's specific assignments of error, shall be incorporated into the opinion.

*Attorney General Rufus L. Edmisten by Assistant Attorney General Joan H. Byers for the State.*

*Appellate Defender Adam Stein and Ann B. Peterson pro hac vice for the defendant-appellant.*

COPELAND, Justice.

Defendant brings forward many assignments of error which he contends require a new trial of these crimes, or a new sentencing hearing, or both. We disagree and affirm the sentences of death imposed upon the jury's recommendations.

At the outset, we must note that defendant's appellate counsel filed a brief which is 109 pages long.[1] A defendant who stands convicted in a capital case is, of course, entitled to effective and diligent advocacy in the presentation of his appeal. However, defendant's brief seems unduly lengthy and quite repetitious. Common sense dictates that there must be an end to what can be said in behalf of any cause and that good judgment and prudence should prevail in the legal art of brief-writing.[2] Indeed, the volume of a brief should always be an accurate reflection of the substance of the arguments presented therein. We therefore exhort practitioners before this Court to seek excellence first, not excessiveness, in the preparation of briefs and remind them that the ability to be direct and concise is a formidable weapon in the arsenal of appellate advocacy. We now direct our attention to the merits of the case and address defendant's arguments in the order in which they appear in his brief.

## GUILT PHASE: I-V

### I.

[1] Forty-two veniremen were examined over a period of five days before a jury of twelve was impanelled to try this case. During the selection process, the trial court excused eight prospective jurors for cause due to their stated opposition to the death

---

1. The State was understandably forced to respond in like kind with a 90 page brief.

2. Our Rules of Appellate Procedure do not set a formal limit upon the length of a brief.

penalty. Defendant contends that the trial court's action deprived him of his constitutional rights of due process and trial by jury. The record plainly refutes this argument.

The applicable constitutional standard permits the excuse of a potential juror for cause if it is established that he "would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case. . . ." *Witherspoon v. Illinois*, 391 U.S. 510, 522 at n. 21, 88 S.Ct. 1770, 1777, 20 L.Ed. 2d 776, 785 (1968); *see State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed. 2d 796 (1980). It is unmistakably clear that seven of the eight potential jurors were properly excused according to this standard after they each stated unequivocally that, even before hearing any evidence in the case, they could not under any circumstances impose the death penalty upon this defendant. *State v. Oliver*, 302 N.C. 28, 39-40, 274 S.E. 2d 183, 191 (1981). It is equally clear that the remaining juror, Mary Neal, was also correctly removed from the panel when, after some initial equivocation, she finally stated that she did not "believe" that she could impose the death penalty regardless of the evidence. The court thereupon asked her, "Do I understand that you could not even before you hear the testimony under any circumstances, impose the death penalty?" Ms. Neal replied, "No, I just don't think so." Considering her answers contextually, we find that Ms. Neal expressed a sufficient refusal to follow the law, that of capital punishment, which might become applicable to the case. *State v. Avery*, 299 N.C. 126, 137, 261 S.E. 2d 803, 810 (1980); *see State v. Taylor*, 304 N.C. 249, 266, 283 S.E. 2d 761, 773 (1981).

The excuse of these jurors for cause did not deprive defendant of his constitutional rights to trial by a jury representing a cross-section of the community or due process of law. *State v. Avery, supra*, 299 N.C. at 137-38, 261 S.E. 2d at 810; *State v. Cherry, supra*, 298 N.C. at 106, 257 S.E. 2d at 564. We would add, moreover, that the need for their excuse was manifest. It would have amounted to an absurdity and a mockery of our law to have permitted these jurors to sit on a case where imposition of the death penalty was an available sentencing option. For, if capital cases could be tried by juries which included persons *firmly* opposed to the maximum prescribed penalty sought by the State, the separate sentencing hearing mandated by G.S. 15A-2000

would almost certainly become a futile and meaningless exercise, contrary to the expressed will of our citizenry in the enactment of capital punishment legislation.

## II.

[2]   At trial, defendant contested the premeditation and deliberation elements of first degree murder primarily through the presentation of an intoxication defense. Defendant believes that he was unconstitutionally deprived of the substance of this defense by certain improper comments of the prosecutor and a series of erroneous rulings by the trial court.[3] We are not so persuaded and overrule these assignments of error.

(a) In his closing argument to the jury, the district attorney stated, in pertinent part, the following:

> [E]ven if you want to conclude that Michael Pinch was drunk because he said in the statement some time that he was, he's still guilty because drunkenness is no defense. You have to be so drunk as to be utterly and totally incapable, unable to form the intent to kill and to carry that out; so drunk as to be unable, incapable of understanding the nature and consequence of your act. That is not present here. There is no way you can conclude that anybody was intoxicated to that extent — not on these facts.
>
> .   .   .   .
>
> You can't find it in your conscience and mind, your heart to dignify what happened out there and impartially excuse it on voluntary intoxication. It is not present on this evidence. I suggest to you that there is not even ample evidence to find that he was intoxicated or drunk. . . . No drugs in this case. Beer. Just beer. You just — you can't let him sell that to you. It is not there. It didn't happen. Nobody could have been intoxicated to the extent that the law requires and do what he did in the manner he did it. There just simply — it is offensive

---

3. This "single" argument in defendant's brief really addresses four distinct issues (howbeit with a common denominator: the intoxication defense). Clarity of review is enhanced by the *separate* statement of each question and its corresponding argument. *See* N.C. Rules of Appellate Procedure, Rule 28(b)(3) [Revised Rule 28(b)(5) (Supp. 1981)].

to reason and common sense. It stinks to high heaven. (Record at 241, 250.)

We can perceive no error in this. Contrary to defendant's assertions, the district attorney correctly conveyed the substance of the law of intoxication to the jury. *See State v. Goodman*, 298 N.C. 1, 12-14, 257 S.E. 2d 569, 578-79 (1979). In addition, although some of the foregoing comments were colorful in terminology, we find that as a whole the remarks were compatible with the evidence in the case and that the district attorney was certainly authorized to argue to the jury that the facts did not support a credible defense of intoxication.[4] *See State v. Noell*, 284 N.C. 670, 202 S.E. 2d 750 (1974), *death sentence vacated*, 428 U.S. 902, 96 S.Ct. 3203, 49 L.Ed. 2d 1205 (1976).

(b) We likewise believe that the trial court's instructions upon the intoxication defense were entirely correct. The record shows that the able judge carefully explained the law in every respect in accordance with the decisions of this Court. *See State v. Propst*, 274 N.C. 62, 161 S.E. 2d 560 (1968); N.C.P.I.—Crim. 305.10 (1970). *See also* 4 Strong's N.C. Index 3d, Criminal Law § 6 (1976). We also reject defendant's argument that the judge improperly shifted the burden to defendant to disprove his capacity to form a specific intent to kill after premeditation and deliberation. Viewed as a whole, the judge's charge was not reasonably susceptible of such an erroneous interpretation.

[3] (c) Defendant contends that the trial court erred in denying his pre-trial motion for an order directing the district attorney to make the State's eyewitnesses "available" for interviews with a medical expert who had been appointed to assist in the preparation and evaluation of an intoxication defense. It should be

---

4. Under this argument heading in the brief, appellate counsel improperly listed several other exceptions to remarks of the district attorney which were unrelated to the intoxication defense. Such exceptions are not pertinent to the precise question stated. *See* Rule 28(b)(3), *supra*, note 3. Five of these exceptions are argued *again* under assignment of error no. 27 which is reviewed in Part V of the opinion, *infra*. With regard to the remaining "irrelevant" exceptions presented here, it suffices to say that the comments, which were not objected to at trial, did not transcend the permissible bounds of argument in hotly contested cases and certainly did not amount to gross improprieties in any event. *See State v. Lynch*, 300 N.C. 534, 268 S.E. 2d 161 (1980); *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979).

recognized at once that nothing in our statutory discovery provisions would require *the State to compel* its witnesses to submit to any form of interview or questioning by the defense prior to trial; in fact, the State does not even have to afford the defense pretrial access to a list of its potential witnesses or copies of any statements they may have made. *See* G.S. 15A-903 and 15A-904; *State v. Lake*, 305 N.C. 143, 286 S.E. 2d 541 (1982); *State v. Abernathy*, 295 N.C. 147, 244 S.E. 2d 373 (1978). Nevertheless, it is true that a prosecutor has an implicit duty not to *obstruct* defense attempts to conduct interviews with *any* witnesses; however, a reversal for this kind of professional misconduct is only warranted when it is clearly demonstrated that the prosecutor affirmatively instructed a witness not to cooperate with the defense. *State v. Mason*, 295 N.C. 584, 587-88, 248 S.E. 2d 241, 244 (1978), *cert. denied*, 440 U.S. 984, 99 S.Ct. 1797, 60 L.Ed. 2d 246 (1979); *State v. Covington*, 290 N.C. 313, 343, 226 S.E. 2d 629, 649 (1976).

This record contains no such showing. The only indication of *possible* prosecutorial misbehavior is the bare allegation of defense counsel in the motion that the district attorney had told him of his specific refusal to allow the interviews in question. We find nothing in the record to substantiate this claim nor any evidence tending to show that defense counsel actually approached the potential witnesses for the stated purpose only to be rejected on account of the district attorney's prior, direct instructions to them against their cooperation. Defendant has therefore failed to present adequate grounds for reversal. *State v. Mason, supra.* In addition, the bare summary of the proceedings held by the court upon the motion make it plain that the *witnesses themselves* refused to talk with the defense expert *on the advice of their own individual attorneys.* Record at 51. Under these circumstances, neither the State nor the trial court had the power to interfere with the attorney-client privileges of the witnesses or to jeopardize their own future defenses.[5] Viewed in this light, it would have been a vain act indeed for the trial court to order the State to provide the defense with something which was, for all practical purposes, completely unavailable.

---

5. The witnesses sought by the defense to construct its intoxication theory were the persons who were present during the commission of the murders (and participated in the concealment thereof).

In this context, the trial court did all that it could reasonably do by initially providing the defense with $1500 in state funds to hire the medical expert. In denying the motion to compel the interviews, the court reminded the defense that the same necessary information could be obtained if the expert attended the trial and listened to the witnesses' actual testimony.[6] If, as it is suggested, the additional cost of the psychiatrist's time to do just that was prohibitive, defense counsel could have taken notes upon the testimony or relayed a transcript to the doctor for his formulation of an opinion upon the extent of defendant's impairment from intoxication at the time of the killings. We conclude that the denial of the motion did not deprive defendant of effective assistance of counsel or a fair trial. *See also State v. Williams* (I), 304 N.C. 394, 404-06, 284 S.E. 2d 437, 445-46 (1981).

[4]　(d) We must now consider whether defendant's constitutional rights of confrontation and due process were unlawfully restricted by the trial court's sustension "of the prosecutor's objections to the defendant's cross-examination of the State's witnesses concerning the amount of beer drunk by the defendant, his level of intoxication and the nature of his behavior. . . ." Defendant's Brief at 30. Our review is governed by the well-established rule that the scope of cross-examination rests largely within the discretion of the trial court, and its rulings thereon will not be disturbed absent a clear showing of abuse or prejudice. *State v. Atkins*, 304 N.C. 582, 585, 284 S.E. 2d 296, 298 (1981) (and authorities there cited). Defendant has failed to demonstrate error in the trial court's rulings; consequently, we overrule all of the pertinent underlying exceptions listed in defendant's brief.[7]

---

6. It should perhaps be mentioned that the motion for the "pre-trial" interviews was actually filed after the jury selection process had already begun and only three working days before the full trial of the matter actually commenced. [In fact, the trial court heard and denied the motion on the very first day of the trial.]

7. Exceptions nos. 42, 45 and 50 bear no rational relationship to the argument concerning the "impairment" of the intoxication defense. *See* Rule 28(b)(3), *supra*, note 4. We have nonetheless reviewed these exceptions and find that the prosecutor's objections were properly sustained within the trial court's discretion. Exception no. 42 involved a question which was argumentative and irrelevant. Exceptions nos. 45 and 50 involved questions which sought impermissible conclusions from the witnesses about matters which were not within the realm of their personal knowledge. *See* 1 Stansbury's N.C. Evidence § 122, at 384-85 (Brandis rev. 1973).

In several instances, the witnesses actually answered the questions of defense counsel despite the prosecutor's objections and the trial court's sustension thereof (exceptions nos. 27, 28, 48A). The prosecutor did not move to strike the answers, and the trial court did not admonish the jury to disregard them. Thus, defendant effectively received the benefit of the evidence sought after, and he has no corresponding cause for complaint on appeal. *State v. Hopkins*, 296 N.C. 673, 252 S.E. 2d 755 (1979).

In another instance, defense counsel attempted to ask an expert medical witness on recross-examination whether the *victims* were legally intoxicated at the time of their deaths (exception no. 35). We believe that this question concerned irrelevant matters which had no logical tendency to prove a fact in issue at defendant's trial for murder. *See* 1 Stansbury's N.C. Evidence § 77, at 234 (Brandis rev. 1973). The relevant issue at trial was whether *defendant* was too intoxicated to form the specific intent to commit murder in the first degree. Obviously, the nature of his criminal acts was not diminished according to the sobriety or drunkenness of the unfortunate victims. Nevertheless, even assuming that this evidence had some degree of relevancy, however slight, it is unquestionably clear that defendant was not prejudiced by its exclusion on *recross*-examination when the doctor had already repeatedly stated during his direct, cross and redirect examinations that the blood alcohol levels of both victims indicated their intoxication at death.

The remaining exceptions argued herein by defendant are equally meritless. Exceptions no. 40 and 41 concerned defense counsel's questioning of the witness Eanes about whether *he* was "influenced by the alcohol [he] had drunk" on the night of the murders. Exception no. 44 related to the overly broad and legally ambiguous question to Eanes about whether he had *ever* seen defendant when he was not *"high"* on drugs or alcohol. Exception no. 48 involved a question as to whether defendant and Billy Wayne Stanley were "drunk" *when* they "mooned" an officer earlier in the evening of the murder (at the trailer). The trial court did not abuse its discretion in sustaining the prosecutor's objections to these questions, and its rulings thereon did not improperly hinder defendant's efforts to present his intoxication defense. None of the questions sought to elicit relevant information having a *direct* bearing upon *defendant's* intoxication impair-

ment *at the time he committed the murders*. Moreover, none of the questions were competently framed to elicit a witness's opinion about defendant's general intoxication based upon the precise legal meaning of that term. *See, e.g., State v. Carroll*, 226 N.C. 237, 239-240, 37 S.E. 2d 688, 690-91 (1946).

## III.

[5]   The jury was advised by both the prosecutor, in his closing argument, and the trial court, in its final instructions, that the elements of malice and unlawfulness were implied in an intentional killing with a deadly weapon. Defendant maintains that his constitutional right to trial by jury was violated because the jury was not also simultaneously informed that it was not compelled to infer malice and unlawfulness, as the presumption of their existence was rebuttable. *See, e.g., State v. Hutchins*, 303 N.C. 321, 346, 279 S.E. 2d 788, 804 (1981). Upon this record, defendant's position offends reason and is untenable.

The significant and controlling fact in this case is that defendant, through his trial counsel, *conceded* his guilt of the second degree murders of Pachaco and Ausley.[8] Defense counsel stated in his closing argument to the jury:

When we started the case in selecting the jury, we told you—and also in opening remarks . . . that we were not contesting the fact that this young man over here killed two people intentionally with malice. That's never been at issue in this case. He's guilty of second-degree murder. We've admitted that all along. The State has proved it to you, but they didn't really have to. We admitted that.

.   .   .   .

. . . [W]e're admitting the intentional killing and the malice involved in this thing. . . .

.   .   .   .

. . . He's guilty of second-degree murder, two of them. (Record at 226, 236).

---

8. Defendant only contested his guilt of the more grievous offenses, that of murders in the first degree, with the requisite premeditation and deliberation.

In light of defendant's own affirmative admissions of the existence of malice and unlawfulness in his commission of two "second degree" murders, there could not possibly be any constitutional transgressions or prejudice in the remarks of either the prosecutor or the trial court concerning the presumption of the existence of those very same elements in the charges of first degree murder. "The State is not required to prove malice and unlawfulness unless there is some evidence of their non-existence. . . ." *State v. Simpson*, 303 N.C. 439, 451, 279 S.E. 2d 542, 550 (1981); *State v. Hankerson*, 288 N.C. 632, 650, 220 S.E. 2d 575, 588 (1975), *rev'd on other grounds*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed. 2d 306 (1976). *See also Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed. 2d 39 (1979); *State v. White*, 300 N.C. 494, 268 S.E. 2d 481 (1980). Moreover, it is evident from the record that the use of the presumption did not alleviate in any manner the State's overall burden of proving the existence of *every* element of first degree murder beyond a reasonable doubt. The assignment of error is overruled.

## IV.

[6] Dr. John D. Butts, a forensic pathologist, performed the autopsies of the victims and testified at trial about the causes of their deaths. In the course of his testimony, Dr. Butts identified ten photographs as accurately depicting the appearance of the bodies at the time of his examinations. The State then introduced the photographs as exhibits (over defendant's objections). The trial court instructed the jury that it could consider the exhibits only for limited illustrative purposes, not as substantive evidence of guilt. As the jury viewed each photograph, Dr. Butts again identified its subject and explained the nature of the body's appearance as shown. Defendant argues that the introduction of these gruesome photographs and the repetitive testimony connected therewith effectively deprived him of a fair adjudication of his guilt and a fair sentencing hearing. Defendant believes that, since he "readily admitted that he killed both victims with gunshot wounds," there was no legitimate purpose or need for the use of the photographs and that they only served to inflame the passions of the jury to his decided prejudice. We disagree.

The record clearly shows that the photographs were properly introduced according to our rules of evidence. *See State v. Mar-*

*shall,* 304 N.C. 167, 282 S.E. 2d 422 (1981); *State v. Jenkins,* 300 N.C. 578, 268 S.E. 2d 458 (1980). The illustrative relevancy of the photographs, which directly corresponded to Dr. Butts' testimony, was not nullified by defendant's "stipulation" as to the cause of the deaths. *See State v. Elkerson,* 304 N.C. 658, 285 S.E. 2d 784 (1982). In addition, the actual number of the photographs of the two bodies was not impermissibly excessive under the circumstances of this case. *See State v. Sledge,* 297 N.C. 227, 254 S.E. 2d 579 (1979). Finally, the probative force of these depictions of the unattractive markings of the victims' violent deaths (as seen by the medical examiner) was not outweighed by their tendency to repulse the sensibilities, or to arouse the sympathy, of the viewer. *Compare State v. Johnson,* 298 N.C. 355, 259 S.E. 2d 752 (1979); *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328 (1969).

V.

[7]  Defendant assigns as error the district attorney's numerous references to facts outside the record during his closing argument to the jury during the guilt phase. No objection was interposed at trial to any of the alleged instances of misconduct. Despite trial counsel's laxity, the State's argument in capital cases is subject to limited appellate review for the existence of gross improprieties which make it plain that the trial court abused its discretion in failing to correct the prejudicial matters *ex mero motu. State v. Smith,* 294 N.C. 365, 377-78, 241 S.E. 2d 674, 681-82 (1978) (and authorities there cited). Considering them contextually and according to the evidence in the case, we hold that the statements challenged here were not extremely or grossly improper.

First, there was nothing wrong with the district attorney's remarks about defendant's enjoyment of the killings. Such comments were supported by the evidence and the reasonable inferences therefrom. *See State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125 (1975). For example, Billy Wayne Stanley testified that defendant had a grin on his face when he shot the victims, and Officer Fuller testified that defendant had told him that his only regret about the death of Pachaco was that he would not be able to kill him again. Second, the district attorney's statements describing what defendant must have been thinking as he sat quietly behind the bar holding the shotgun were not so prejudi-

cial that the trial court was required to take corrective action even in the absence of an objection. *See State v. King*, 299 N.C. 707, 711-13, 264 S.E. 2d 40, 43-44 (1980). Third, and finally, we perceive no gross error in the following "comparisons" made by the State: "You've got to understand the nature of the animal you're dealing with here. I'm not a zoologist, but I don't know of a single living species on this planet that kills for pleasure. Tigers kill to eat, sharks kill to eat. Michael Pinch kills for pleasure. Think about that." Record at 250. This uncomplimentary and disparaging characterization of defendant was entirely warranted by the evidence, *State v. Ruof*, 296 N.C. 623, 252 S.E. 2d 720 (1979); *State v. Westbrook*, 279 N.C. 18, 181 S.E. 2d 572 (1971), *death sentence vacated*, 408 U.S. 939, 92 S.Ct. 2873, 33 L.Ed. 2d 761 (1972).

SENTENCING PHASE: VI-XIX

VI.

Defendant again maintains that the district attorney improperly injected facts outside the record into his jury argument — this time during the sentencing phase of the trial. The scope of argument at the sentencing hearing is governed by the same general rules that apply to argument during the guilt proceedings; consequently, when the remarks challenged on appeal were not objected to at trial, the alleged impropriety must be glaring or grossly egregious for this Court to determine that the trial judge erred in failing to take corrective action *sua sponte*. *See State v. Johnson*, 298 N.C. 355, 368-69, 259 S.E. 2d 752, 760-61 (1979). The prosecutorial expressions attacked in this appeal do not fall within the realm of reversible transgressions.

All three of the exceptions set out in the brief under this assignment of error concern the district attorney's statements that the murders were especially despicable, heinous and cruel because defendant executed the victims for sport, recreation and the amusement of his friends. We have already held in part V of the opinion, *supra*, that the evidence in the case reasonably supported a conclusion that defendant enjoyed committing these crimes. That being so, it is clear that the district attorney's further extrapolations at sentencing about the unusually callous and playful nature of defendant's murderous acts were also legitimate under the evidence and were not extreme or prejudicial *per se*.

## VII.

Defendant offered much evidence in mitigation of his acts during the penalty phase. In several instances, however, the trial court excluded certain evidence upon the prosecutor's objections. Defendant argues that the trial court thereby deprived him of due process and the right to be free from cruel and unusual punishment.

Defendant's contentions must be examined against the backdrop of our capital punishment statute which provides, in conformity with the constitutional mandates of the Eighth and Fourteenth Amendments, that any evidence may be presented at the separate sentencing hearing *which the court deems* "relevant to sentence" or "to have probative value," including matters related to aggravating or mitigating circumstances. G.S. 15A-2000(a)(3); *see Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed. 2d 973 (1978). The circumstances of the offense and the defendant's age, character, education, environment, habits, mentality, propensities and criminal record are generally relevant to mitigation; however, the ultimate issue concerning the admissibility of such evidence must still be decided by the presiding trial judge, and his decision is guided by the usual rules which exclude repetitive or unreliable evidence or that lacking an adequate foundation.[9] *See State v. Johnson*, 298 N.C. 355, 367, 259 S.E. 2d 752, 760 (1979); *State v. Cherry*, 298 N.C. 86, 98-99, 257 S.E. 2d 551, 559 (1979), *cert. denied*, 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed. 2d 796 (1980). *See also State v. Goodman*, 298 N.C. 1, 30-31, 257 S.E. 2d 569, 588 (1979). Consequently, we believe that a new sentencing hearing should not be ordered by this Court for the trial judge's exclusion of evidence at the penalty phase unless the defendant demonstrates the existence of patent, prejudicial error. No such showing has been made here.

---

9. This does not mean that the evidentiary rules which normally apply at the guilt phase of the trial should also apply with *equal force* in the sentencing phase. Evidentiary flexibility is encouraged in the serious and individualized process of life or death sentencing. *See Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). However, as in any proceeding, evidence offered at sentencing must be pertinent and dependable, and, if it passes this test in the first instance, it should not ordinarily be excluded. G.S. 15A-2000(a)(3), *supra; see Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed. 2d 738 (1979).

[8]  Specifically, defendant argues that the trial court's susten-
sion of various objections by the prosecutor thwarted his at-
tempts to inform the jury about his "growing awareness of the
uselessness of his life up to that point, the pain he caused others,
a growing sense of maturity and feelings of remorse and regret."
Defendant's Brief at 53. We find that, although some evidence
was indeed excluded, the record as a whole is replete with
evidence of these matters, and defendant suffered no prejudice
whatsoever from the trial court's rulings.

It is true that the trial court sustained an initial and single
objection to defendant's testimony about his current feelings of
remorse over Pachaco's death; nevertheless, defendant thereafter
proceeded to testify in detail about his change in heart and regret
without further objection by the prosecutor. Record at 278-79. In
addition, Dr. Royal, a forensic psychiatrist, testified about defend-
ant's expressed remorse over Ausley's death. Record at 285.
Since substantial evidence of defendant's regrets had already
been received, it was not error for the court to exclude (upon ob-
jection) further testimony upon the same subject by the witness
Sherry Olivey. In any event, defendant later succeeded in in-
troducing more evidence about his repentant statements since the
killings through the testimony of his sister and mother. Record at
289, 291-92. We likewise find no reversible error in the trial
court's limited admission of defendant's five proffered exhibits
consisting of letters he had written to his mother while he was in-
carcerated pending trial. These letters added little to the *in-court*
testimony of defendant and his witnesses about his present
awareness of what he had done and his sorrow for it. Even so, the
trial court permitted defendant's mother to read to the jury all of
exhibit five and portions of exhibits three and four in which
defendant had essentially stated, both in prose and poem, that it
hurt him to know that he was capable of taking another's life,
that he was living for the future and cleaning up his act, and that
he had a mature and sincere desire to fulfill his part in life and
society properly. Record at 297-99. The letters totally excluded by
the court, exhibits one and two, merely repeated the same things,
howbeit using different words or examples, about his remorse and
his wish to be a better person. Moreover, these two letters includ-
ed much material which plainly was not relevant to sentencing,
*i.e.*, his apologies to his mother for not having been a better son

to her despite her good efforts and his rambling philosophical questionings about why he had turned out to be so bad.

Defendant also maintains that the trial court erred in not permitting Sherry Olivey to testify about *the circumstances of his various hospitalizations* for drug overdoses. We disagree. Ms. Olivey testified that she knew of occasions where defendant had taken a drug overdose and that she had visited him in Cone Memorial Hospital three months after the crimes. Certainly, defendant's *habits* regarding alcohol and drug misuse were relevant mitigating factors for the jury's consideration; however, the precise details of his particular overdoses were not pertinent to his sentencing. It was enough that the jury was informed by Ms. Olivey that:

> I can honestly say that he [defendant] drank or took something every day that I've known him [two years] . . . . He always went to the max on everything to where he couldn't walk anymore or was passed out. I have seen him when he has gone too far in the use of alcohol or the use of drugs. I have seen him take alcohol or drugs to the point where he is unconscious or in some state like that. Record at 286-87.

Defendant finally challenges the trial court's refusal to admit certain expert testimony. These contentions lack merit. The court correctly sustained the prosecutor's objection to defense counsel's attempt to elicit an opinion from a psychiatrist about whether defendant "would be able to adjust to life in prison." Such an opinion would have concerned a matter totally irrelevant to sentencing. Defendant stood convicted of two first degree murders. *Regardless* of his ability to adjust to prison life, by law, defendant was already subject to the mandatory imposition of life imprisonment for those crimes. *See* G.S. 14-17; G.S. 15A-2000(a)(1), 15A-2002. The issue to be determined by the jury at the penalty phase was not whether defendant would prove to be a "good" prisoner but whether the overall nature of the murders and defendant's attendant acts warranted imposition of the *maximum* available penalty — death in the gas chamber.[10] The trial court also

10. Even assuming that defendant's ability to cope in prison had some slight relevancy to his sentencing, we would still hold that the psychiatrist's opinion was properly excluded because there was an insufficient foundation in the record for a

properly excluded the opinion of another psychiatrist about de-
fendant's blood alcohol levels at the time of the shootings. Clear-
ly, such evidence would have been relevant; however, as the
doctor plainly admitted that he could not render an opinion within
a reasonable degree of medical certainty, the evidence was
unreliable and lacked probative value.

In sum, defendant is not entitled to a new sentencing hearing
upon the ground that the foregoing classes of evidence were er-
roneously restricted or rejected by the trial court.

## VIII.

[9] At the penalty phase, defendant testified that he had been
drinking alcohol and taking or injecting all kinds of illicit drugs
since he was fourteen years old. He also stated that he had been
consuming approximately twelve beers a day for the three years
preceding the murders. Obviously, this testimony tended to
bolster defendant's evidence of mitigating circumstances. The
prosecutor responded by cross-examining defendant about where
he got the money to buy all the beer and drugs which he said he
had taken every day for five years. Defendant answered that he
had money even though he had not been employed. The pros-
ecutor repeatedly asked defendant to identify the specific source
of that money, but defendant only replied, "I just got it." The
prosecutor finally asked him, "Who did you steal from?" The trial
court sustained defense counsel's immediate objection to the ques-
tion. Defendant complains that the prosecutor's persistent ques-
tioning about the money improperly suggested to the jury that he
must have committed other criminal offenses to support his
habits. On the whole, we find no prejudicial error.

As a general matter, the truthfulness of any aspect of any
witness's testimony may be attacked on cross-examination. See 1
Stansbury's N.C. Evidence §§ 39-40 (Brandis rev. 1973). This basic
rule applies to all trial proceedings, including both the guilt and
sentencing phases in capital cases. Thus, it is clear that the pros-

conclusion that he was better qualified to have an opinion on this subject than the
jury. There was no evidence specifying the doctor's special experience with the
prison environment, and the question posed to him essentially requested nothing
more than his speculations about defendant's future prison "performance" based
merely upon his observations of defendant's behavior in a mental hospital for three
and a half weeks.

ecutor could properly attempt to impeach defendant's testimony about the actual *extent* of his destructive habits. Defendant's ability to afford the necessary items certainly bore upon the credibility of his self-serving statements about their constant use.

In addition, the persistent nature of the prosecutor's questioning was not abusive in light of defendant's evasive and unresponsive answers. The scope and fairness of the cross-examination was a matter left to the sole discretion of the trial judge, and the prosecutor had a right to sift or press defendant in order to get a direct and clear response. *See State v. Williams*, 303 N.C. 142, 147, 277 S.E. 2d 434, 438 (1981); *State v. Currie*, 293 N.C. 523, 529, 238 S.E. 2d 477, 481 (1977).

On the other hand, however, it seems that defendant's objection to the prosecutor's inferential inquiry about the stealing was well taken. The question amounted to a speculative insinuation of prior criminal conduct with no ascertainable good faith *factual* basis. See *State v. Shane*, 304 N.C. 643, 651, 285 S.E. 2d 813, 818 n. 3 (1982). Still, it was a *single* impropriety, and this case is, therefore, markedly different from *State v. Phillips*, 240 N.C. 516, 82 S.E. 2d 762 (1954), where the prosecutor cross-examined the defendant in detail about *seventeen* unproved accusations of prior misconduct. Thus, we hold that the trial court's prompt sustension of defendant's objection to the disapproved question sufficiently averted any prejudice to defendant. *See State v. Williams*, *supra*, 303 N.C. at 147, 277 S.E. 2d at 438.

IX.

[10] Defendant assigns further error to the district attorney's jury argument during the sentencing phase. We have already overruled several of the same supporting exceptions in Part VI of the opinion, *supra*, where we set forth the controlling standard of review of any jury argument which is not objected to at trial. To avoid redundancy, we shall not plow those rows again, instead, we shall limit our review to a consideration of the *additional* exceptions presented here.[11]

---

11. We are compelled to question appellate counsel's organizational rationale for raising further challenges to the sentencing argument here when, logically, all contentions of this type should have been argued together in the same portion of the brief.

Let us begin by saying that prosecutorial statements are not placed in an isolated vacuum on appeal. Fair consideration must be given to the context in which the remarks were made and to the overall factual circumstances to which they referred. Moreover, it must be remembered that the prosecutor of a capital case has a duty to pursue ardently the goal of persuading the jury that the facts in evidence warrant imposition of the ultimate penalty. G.S. 15A-2000(a)(4); *State v. Myers, 299 N.C. 671, 680, 263 S.E. 2d 768, 774 (1980); State v. Johnson, 298 N.C. 355, 367, 259 S.E. 2d 752, 760 (1979); State v. Westbrook, 279 N.C. 18, 37, 181 S.E. 2d 572, 583 (1971), death sentence vacated, 408 U.S. 939, 92 S.Ct. 2873, 33 L.Ed. 2d 761 (1972).*

In this case, it is evident that the district attorney argued for capital punishment of defendant's murder convictions with much vim and vigor. Record at 306-10. Contrary to defendant's assertions, however, we do not believe that the district attorney's zeal caused him to overstep the bounds of permissible argument. Examining his statements in their complete context, we are convinced that he did not say anything which would amount to a gross impropriety. His comment that defendant was "not Jack the Ripper yet" was tempered by the prior explanation to the jury that it could consider any facts or circumstances which it deemed to have mitigating value, including defendant's admitted lack of significant criminal history. The district attorney's expressions concerning his belief in the death penalty and the propriety of its imposition in the case must be weighed with his frequent reminders to the jury that *it* would have to determine what the appropriate punishment should be.[12] *Compare State v. Smith,* 279 N.C. 163, 181 S.E. 2d 458 (1971). The characterization of defendant's mind as a "cesspool" cannot be deemed unfair in light of defendant's own admissions that he killed the victims intentionally and maliciously simply because Pachaco had wrongfully worn

12. For example, the district attorney stated:

I don't know what you will conclude is appropriate. I suggest to you, with all due respect, that the conduct is appropriate to be rewarded with the ultimate sanction that our law provides.

We're all people of great ability and conscience, and I ask you to consider what is appropriate for this act. Consider what is justice for Michael Pinch and for what he did. Consider the two dead boys that he left in his wake.

the insignia or emblem of a motorcycle gang sometime in the past. The statement to the jury that it would not have hesitated to give defendant his "just reward" right there on the spot if it had actually witnessed the murders, although disapproved by us, was not an inflammatory invitation for the jury to act like a lynch mob. The district attorney noted that the law did not work that way. His comment was a colorful attempt to emphasize the cruelty and callousness with which defendant killed the victims. Finally, there was nothing inherently prejudicial in the district attorney's complaints about how he could not bring in family members to testify about the "trials and travails" of *Pachaco's* life, in contrast to all of the evidence about defendant's family and personal history received in mitigation. The district attorney was merely reminding the jury that, although it did not know much about him, it should also carefully consider the value of the victim's life in making its life or death decision about defendant.

## X.-XI.

[11] Defendant tendered in writing the following ten circumstances in mitigation:

1. The defendant has no significant history of prior criminal activity.

2. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired.

3. The age of the defendant at the time of the crime.

4. The defendant voluntarily admitted his culpability immediately after his arrest and cooperated with police efforts to clarify the evidence in these cases and other pending cases arising out of the incident.

5. The defendant since his incarceration has appreciated the severity and error of his conduct.

6. The defendant since his incarceration has ceased the use of alcohol and drugs and is able to function with more maturity and responsibility.

7. The defendant lacks education and has a relatively low mentality.

8. The environment in which the defendant lived until the time of his arrest was infused with violence and accepted violence as an [sic] problem-solving technique.

9. The defendant's childhood history, background, and record shows no indication of a habitually violent nature.

10. Any other circumstances or circumstances arising from the evidence which you, the jury deem to have mitigating value. Record at 275.

With the exception of the last portion of number seven regarding defendant's "relatively low mentality," the trial court honored defendant's request and submitted all ten of these mitigating factors to the jury. Defendant argues that the trial court thereby erred in two ways: (1) in failing to submit his low mentality in mitigation as requested and (2) in failing to submit upon its own motion the additional statutory mitigating circumstance of G.S. 15A-2000(f)(2), i.e., that he committed the murders while he was "under the influence of mental or emotional disturbance." We conclude that defendant's contentions cannot be sustained on this record.

This Court has previously established instructive guidelines for the trial judges of our State to follow in the submission of mitigating circumstances, including those which arise upon the evidence in a given capital case as well as those specified in G.S. 15A-2000(f). First, in State v. Goodman, we held that, although the jury's consideration of any factor relevant to the circumstances of the crime or the character of the defendant may not be restricted, the trial court "is not required to sift through the evidence and search out every possible circumstance which the jury might find to have mitigating value," especially when the trial court instructs the jury upon the open-ended provision of G.S. 15A-2000(f) (9) and thus does not hinder it from evaluating on its own anything of mitigating value. 298 N.C. 1, 33-34, 257 S.E. 569, 589-90 (1979). Second, in State v. Johnson, we held that the trial court must include additional factors, which are timely requested by the defendant, on the written list submitted to the jury if they are "supported by the evidence, and . . . are such that the jury could reasonably deem them to have mitigating value. . . ." 298 N.C. 47, 72-74, 257 S.E. 2d 597, 616-17 (1979) (emphasis added). Third, in State v. Hutchins, we held that, although the trial court

has a fundamental duty to declare and explain the law arising upon the evidence, it is not required to instruct upon a *statutory* mitigating circumstance *sua sponte* unless defendant, who has the burden of persuasion, brings forward sufficient evidence of the existence of the specified factor. 303 N.C. 321, 355-56, 279 S.E. 788, 809 (1981); *see State v. Taylor*, 304 N.C. 249, 277, 283 S.E. 2d 761, 779 (1981).

The rules of the foregoing cases are sound and practical, and we therefore exhort our trial judges to adhere to them carefully when presiding over the trial of capital cases. Moreover, we must also point out that common sense, fundamental fairness and judicial economy dictate that any reasonable doubt concerning the submission of a statutory or requested mitigating factor be resolved in the defendant's favor to ensure the accomplishment of complete justice at the *first* sentencing hearing. Nevertheless, the same standard of appellate review continues to apply whether the trial court commits error at the guilt phase or the penalty phase; thus, a new sentencing hearing will *not* be ordered for the erroneous failure to submit a mitigating circumstance if that error was *harmless beyond a reasonable* doubt. G.S. 15A-1443(b); *see State v. Williams* (I), 304 N.C. 394, 425-26, 284 S.E. 2d 437, 456-57 (1981) (erroneous submission of aggravating circumstance was prejudicial and required new sentencing hearing); *State v. Taylor*, *supra*, 304 N.C. at 285-88, 283 S.E. 2d at 783-85 (erroneous submission of aggravating circumstance was not prejudicial).

The sum of the matter is this—a defendant demonstrates reversible error in the trial court's omission or restriction of a statutory or timely requested mitigating circumstance in a capital case only if he affirmatively establishes three things: (1) that the particular factor was one which the jury could have reasonably deemed to have mitigating value (this is presumed to be so when the factor is listed in G.S. 15A-2000(f)); (2) that there was sufficient evidence of the existence of the factor; and (3) that, considering the case as a whole, the exclusion of the factor from the jury's consideration resulted in ascertainable prejudice to the defendant. The defendant in the instant case fails this three-prong test for a new sentencing hearing.

We first analyze defendant's request for an instruction upon his "relatively low mentality." This factor is not listed in G.S.

15A-2000(f); however, our cases plainly indicate that the mentality of a defendant is generally relevant to sentencing and that it can, with supporting evidence, be properly considered in mitigation of a capital felony. *See State v. Johnson*, 298 N.C. 355, 367, 259 S.E. 2d 752, 760 (1979), and part VII of the opinion, *supra*. In this case, a psychiatrist testified that defendant had scored 66 on an intelligence test. This fact unquestionably related to defendant's mentality, and we believe that defendant would have been entitled to an instruction about his specific intelligence quotient *if* he had tendered a properly worded request therefor. *See, e.g., State v. Williams*, 304 N.C. 394, 401, 284 S.E. 2d 437, 443 (1981); *State v. Rook*, 304 N.C. 201, 211 n. 1, 283 S.E. 2d 732, 739 (1981), *cert. denied*, --- U.S. ---, 81 S.Ct. 6143, 72 L.Ed. 2d 155 (1982). However, we do not believe that defendant's evidence adequately authorized the submission of the instruction he did request which used the terms "relatively low mentality." In this regard, the psychiatrist testified that defendant's "other tests indicated that his I.Q. was probably a little higher than [66] and fell at least into the *low-normal range of intelligence*." Although we are not schooled in the medical art of psychiatry, we think that one would not commonly understand low to normal intelligence to be reasonably synonymous with relatively low mentality. Consequently, we hold that the trial court did not err in refusing to instruct the jury in this respect. In any event, the omission could not have possibly been prejudicial since the trial court told the jury it could evaluate "[a]ny other circumstances or circumstances arising from the evidence which you, the jury deem to have mitigating value." G.S. 15A-2000(f)(9).

For similar reasons, we reject defendant's contention that the trial court erred in not instructing upon a statutory mitigating circumstance *sua sponte*. The evidence simply did not support the submission of G.S. 15A-2000(f)(2). The psychiatrist testified that defendant had "psychological problems" and was "a very passive person that exhibits *some* chronic depression in terms of how he functions in life." He also stated that defendant was "not basically a violent person" and that there was no evidence "that he was an angry acting out type person that you ordinarily find in people that are prone to violence." On cross-examination, the psychiatrist further explained the results of his examination of defendant as follows:

> I also found no evidence of any thought disorder. I found his memory to be adequate and his perception to be adequate. I found that he was always oriented as the time, place and person. I would classify his depression as *mild* depression. I believe that part of his depression would be caused by the incarceration and facing two charges of murder in the first degree. I did not find any evidence of the type of anger that you normally find in people of these subculture groups.

Record at 283-86 (emphases added). This evidence did not, in our opinion, sufficiently show that defendant was somehow *under the influence* of a mental or emotional disorder *at the time* he committed the murders. We also have serious doubts as to whether "some" "mild" "chronic depression" qualifies as a bona fide mental or emotional disturbance under our capital punishment statute. *Compare State v. Taylor, supra* (evidence that defendant had "paranoid psychosis"); *State v. Rook, supra* (psychiatrists gave direct opinions that defendant had a mental disorder or illness); *State v. Johnson, supra* (defendant was diagnosed as schizophrenic). Again, even assuming that the trial court should have instructed upon G.S. 15A-2000(f)(2), its failure to do so did not constitute prejudicial error since the jury could have elected to consider this factor pursuant to the trial court's instruction upon G.S. 15A-2000(f)(9).

## XII.

[12] The trial court submitted each of the two killings as an aggravating circumstance for the other under the "course of conduct" provision of G.S. 15A-2000(e)(11).[13] Defendant argues that this kind of reciprocal aggravation to enhance his punishment for both crimes constituted double jeopardy and deprived him of due process of law.[14] For a precise understanding of the issue raised by defendant, we quote from his brief as follows:

---

13. G.S. 15A-2000(e)(11) lists the following factor for the jury's consideration: "The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons."

14. Defendant's motion to file a supplemental brief on this question was allowed by the Court on 8 March 1982. We shall address defendant's contentions as they are presented in that amplified brief.

In summary, the defendant's claim in this case . . . is that the prosecution faced with two homicides committed by the same person in the same "course of conduct" must choose between two options. The prosecution may use one of the homicides as an aggravating circumstance under § 15A-2000 (e)(11) to support the increased penalty of death for the other. The prosecution may seek a separate conviction for each of the homicides, in which case a death penalty for either must be based on aggravating factors that do not include the other homicide. The double jeopardy clause prohibits the prosecution from using both options, i.e., from obtaining a substantive conviction for a homicide and then using it again as an aggravating circumstance under § 15A-2000(e)(11) to support punishment by death for the other killing. Defendant's Supplemental Brief at 4.

To the contrary, we find no constitutional authority mandating a conclusion by us that the submission of G.S. 15A-2000(e)(11) in aggravation of both murders violated defendant's protection against double jeopardy, and we decline to adopt a position which would prevent the administration and availability of equal justice for equal crimes.[15]

In the instant case, defendant killed two persons at the same place and within minutes of each other. The capital charges were tried together pursuant to defendant's own motion for joinder. The jury found defendant guilty of murder in the first degree, upon the theory of premeditation and deliberation, on both counts. The State was thereupon entitled to seek the death penalty for each murder, and it properly did so. The State sought the death penalty based upon the aggravating circumstances of *both* G.S. 15A-2000(e)(9) and (11). The jury found that these aggravating circumstances outweighed the mitigating beyond a reasonable doubt and recommended the death penalty in each case. There was no constitutional error in the procedure employed.

---

15. We reach the same conclusion in another death penalty case filed by our Court today: *State v. Williams* (II), 305 N.C. 656, 292 S.E. 2d 243 (1982). In *Williams (II)*, the defendant was tried separately in two counties for two murders. Each murder was submitted as reciprocal aggravation for the other under G.S. 15A-2000(e)(11) at defendant's separate trials. *See State v. Williams* (I), 304 N.C. 394, 284 S.E. 2d 437 (1981).

The cases principally relied upon by defendant are clearly inapposite, and the reasoning of those cases simply cannot be stretched to encompass the imaginative and innovative standard of double jeopardy which defendant seeks to impose at *the initial sentencing hearing jointly held upon dual capital convictions*. For example, both the United States Supreme Court's decision in *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed. 2d 270 (1981), and the decision of this Court in *State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981), addressed the double jeopardy implications which arise in the event a new trial or a new sentencing hearing is required in a capital case after the jury has already decided the punishment issue either for or against the defendant. Such is plainly not the situation here, and we need not search out hidden nuances of the double jeopardy clause in order to decide the case before us. It is sufficient to recognize that the thrust of the concept of double jeopardy is that a defendant may not be unfairly subjected to multiple prosecutorial attempts to obtain a conviction or a certain penalty for the same offense nor may a defendant receive multiple punishment for the same offense. *See Bullington v. Missouri, supra; State v. Silhan, supra.*

Regardless of the formula utilized, the jury's *consideration* of a defendant's commission of "other crimes of violence," in making its ultimate penalty recommendation for that defendant's conviction of a related but separate capital offense, is not logically equivalent to the defendant receiving multiple punishment for the same crime. This is especially true where, as here, the prosecution relies on an additional aggravating circumstance which is also subsequently found by the jury. In short, the principle of double jeopardy has not evolved, as defendant argues, to the point that it prevents the prosecution from relying, at the sentencing phase of a capital case, upon a related course of criminal conduct by the defendant as an aggravating factor to enhance the punishment of defendant for another distinct offense, and this is so, irrespective of whether the defendant was also convicted of another capital charge arising out of that very same course of criminal conduct and subjected to separate punishment therefor. *See, e.g., State v. Hutchins*, 303 N.C. 321, 347, 279 S.E. 2d 788, 804 (1981) (reciprocal aggravation of two first-degree murders under G.S. 15A-2000(e)(11) ). *See also State v. Cherry*, 298 N.C. 86, 113, 257 S.E. 2d 551, 568 (1979), *cert. denied*, 446 U.S. 941, 100 S.Ct.

2165, 64 L.Ed. 2d 796 (1980) (discussing the use of an underlying felony, which accompanies the commission of a premeditated murder, as an aggravating circumstance under G.S. 15A-2000(e) (5) ).

In conclusion, we hold that the enhancement of defendant's penalty on the one hand for Pachaco's murder did not result in an unconstitutional duplication of defendant's penalty on the other hand for Ausley's death, and vice versa, simply because defendant's overall violent conduct was submitted in aggravation on each hand under G.S. 15A-2000(e)(11). It is the very fact that defendant killed two people, and not just one, that aggravates the nature of his crimes, and it was entirely proper for the jury to consider this fact in determining whether defendant should pay the ultimate price for *each* life he took.

## XIII.

[13] Defendant assigns error to the trial court's direction to the jury that it need not specify which mitigating circumstances on the written list it found. This same issue was recently addressed at length in *State v. Rook*, where we stated: "While defendant makes a good argument that it is the better practice, and we agree, to require the jury to specify mitigating factors found and not found for the benefit of this Court in reviewing the appropriateness of the death penalty, we find no such requirement in our statutes." 304 N.C. 201, 231, 283 S.E. 2d 732, 751 (1981), *cert. denied,* --- U.S. ---, 81 S.Ct. 6143, 72 L.Ed. 2d 155 (1982). Moreover, in *State v. Taylor*, we also found "no merit in defendant's contention that since the jury had to answer each aggravating circumstance specifically but did not have to answer which mitigating circumstances they found, that placed undue emphasis on the aggravating circumstances." 304 N.C. 249, 285, 283 S.E. 2d 761, 783 (1981). It suffices to say that defendant's similar contentions must be overruled pursuant to the binding authority of both *Rook* and *Taylor*.

## XIV.

[14] Both the prosecutor and the trial court advised the jury that it had a *duty* to recommend a sentence of death if it found three things: (1) that one or more statutory aggravating circumstances existed; (2) that the aggravating circumstances were

substantial enough to warrant the death penalty; and (3) that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. On the other hand, the jury was also advised that it had the duty to recommend a sentence of life imprisonment if it did not find any one of those three things. These directions to the jury were based upon the statutory criteria set forth in G.S. 15A-2000(b) and (c) and conformed to the N.C. Criminal Pattern Jury Instructions § 150.10 (1980).[16]

Nevertheless, defendant assigns error to the foregoing on the basis that such instructions "prejudicially withdrew from the jury its final option . . . to recommend a life sentence notwithstanding its earlier findings." Defendant's Brief at 75. This assignment lacks merit.

The jury had no such option to exercise unbridled discretion and return a sentencing verdict wholly inconsistent with the findings it made pursuant to G.S. 15A-2000(c). The jury may not arbitrarily or capriciously *impose or reject* a sentence of death. Instead, the jury may only exercise guided discretion *in making the underlying findings* required for a recommendation of the death penalty within the "carefully defined set of statutory criteria that allow them to take into account the nature of the crime and the character of the accused." *State v. Johnson*, 298 N.C. 47, 63, 257 S.E. 2d 597, 610 (1979); *see State v. Barfield*, 298 N.C. 306, 349-52, 259 S.E. 2d 510, 541-43 (1979), *cert. denied*, 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed. 2d 1137 (1980). Moreover, defendant's contention was implicitly answered in *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979), in which this Court overruled an assignment of error alleging that the trial court had erred in failing to instruct the jury that it could still recommend life imprisonment even though it found that the aggravating circumstances outweighed the mitigating ones. Justice Britt, speaking for the Court in *Goodman*, explained that:

16. Similar instructions about the jury's duty to return a certain sentencing verdict, based upon its affirmative findings under G.S. 15A-2000(c), were given in three other death cases previously decided by our Court, in which no corresponding exception or assignment of error was raised on appeal: *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied*, 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed. 2d 1137 (1980); *State v. Martin*, 303 N.C. 246, 278 S.E. 2d 214, *cert. denied*, -- U.S. ---, 102 S.Ct. 431, 70 L.Ed. 2d 240 (1981); and *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, --- U.S. ---, 81 S.Ct. 6143, 72 L.Ed. 2d 155 (1982).

[I]t would be improper to instruct the jury that they may, as defendant suggests, disregard the procedure outlined by the legislature and impose the sanction of death at their own whim. To do so would be to revert to a system pervaded by arbitrariness and caprice. The exercise of such unbridled discretion by the jury under the court's instruction would be contrary to the rules of *Furman* and the cases which have followed it.

*Id.* at 35, 257 S.E. 2d at 590. For these reasons, we hold that the jury was correctly informed that it had a duty to recommend a sentence of death if it made the three findings necessary to support such a sentence under G.S. 15A-2000(c).[17]

## XV.

[15]   The trial court instructed the jury upon the statutory aggravating circumstance of G.S. 15A-2000(e)(9), that the murders were "especially heinous, atrocious, or cruel." Defendant essentially contends that the evidence did not support the existence of this factor and that the trial court's instruction upon it thus violated the Eighth Amendment.

In accordance with the dictates of the Eighth Amendment, our Court has adhered to the position that the aggravating circumstance of G.S. 15A-2000(e)(9) "does not arise in cases in which death was immediate and in which there was no unusual infliction of suffering upon the victim." *State v. Rook*, 304 N.C. 201, 226, 283 S.E. 2d 732, 747 (1981), *cert. denied*, --- U.S. ---, 81 S.Ct. 6143, 72 L.Ed. 2d 155 (1982); *see Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed. 2d 398 (1980); *see, e.g., State v. Hamlette*, 302 N.C. 490, 504, 276 S.E. 2d 338, 347 (1981) (submission of G.S. 15A-2000(e)(9) was erroneous). Instead, our Court has made it clear that the submission of G.S. 15A-2000(e)(9) is appropriate only when there is evidence of excessive brutality, beyond that normally present in any killing, or when the facts as a whole portray the commission of a crime which was conscienceless, pitiless or unnecessarily tortuous to the victim. *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979); *see, e.g., State v. Martin*, 303 N.C. 246, 278 S.E. 2d 214, *cert. denied*, --- U.S. ---, 102 S.Ct. 431, 70 L.Ed.

---

17. There is no constitutional infirmity in such an instruction. *See, e.g. Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed. 2d 929 (1976) (cited in the dissent).

2d 240 (1981); *State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183 (1981). It is, therefore, plain that an issue concerning the propriety of the submission of this aggravating factor is resolved according to the peculiar surrounding facts of the capital case under consideration.

Examining the case at bar, we hold that there was sufficient evidence whereby the jury could have reasonably concluded that the murders of Pachaco and Ausley were especially despicable and wanton under G.S. 15A-2000(e)(9). The evidence showed that defendant carefully executed a deliberate and premeditated plan for murder. We have already set out the details of the murders at length in the beginning of the opinion, and it would be repetitious to summarize them again here. It suffices to say that the deaths of the unsuspecting victims were not instantaneous and that both killings involved the infliction of unusual physical or psychological torture. Each victim essentially witnessed (or heard) the shooting of the other and was helpless to prevent this unprovoked horror. The killing of Pachaco was excessively brutal in that defendant, having already shot him once, walked over to where he lay moaning on the floor and shot him again at point blank range. The killing of Ausley was merciless and conscienceless in that defendant shot him as he begged and pleaded for his life. Defendant seemed to enjoy the killings, and he showed no remorse for what he had done at that time. In fact, defendant callously evaluated his conduct in his subsequent announcement to his companions that he had "just blown away two dudes." Viewing the circumstances of the murders as a whole, we hold that the trial court correctly instructed the jury upon G.S. 15A-2000(e)(9).

## XVI.

[16]  The sentence of death in a given case cannot be "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." G.S. 15A-2000(d)(2). Defendant argues that the infliction of the death penalty for these murders would be excessive and disproportionate punishment. We disagree. All things considered, we cannot say, *as a matter of law*, that this defendant is somehow less deserving of capital punishment than the other occupants of death row. *See, e.g., State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981); *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, --- U.S. ---, 81 S.Ct. 6143, 72 L.Ed. 2d 155 (1982); *State v. Hutchins*, 303

N.C. 321, 279 S.E. 2d 788 (1981); *State v. Martin*, 303 N.C. 246, 278 S.E. 2d 214, *cert. denied*, --- U.S. ---, 102 S.Ct. 431, 70 L.Ed. 2d 240 (1981); *State v. McDowell*, 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied*, 450 U.S. 1025, 101 S.Ct. 1731, 68 L.Ed. 2d 220 (1981); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied*, 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed. 2d 1137 (1980). The facts of the instant case speak for themselves and we shall not disturb the factual findings made by the jury under G.S. 15A-2000 (c) in reaching its recommendations for the death penalty in this case.

Within this argument, defendant also urged this Court to adopt several procedures to assist appellate review of the proportionality of the death sentence in a particular case. It would serve no useful purpose to address each suggestion here. Instead, we believe that all of the matters raised by defendant are adequately answered by our two-fold determination that: (1) the review mandated by G.S. 15A-2000(d)(2) (*supra*) provides a sufficient constitutional safeguard against the unconstitutional imposition of cruel and unusual punishment, and (2) the intended *ultimate* emphasis of proportionality review under G.S. 15A-2000(d)(2) is upon the independent consideration of the individual defendant and the nature of the crime or crimes which he has committed.

## XVII.-XIX.

The final three "arguments" presented by defendant's appellate counsel ask us to re-examine the constitutional validity of several prior cases without advancing a single good, logical or compelling reason for doing so. Such spurious disputations lack merit, do not warrant discussion and are not well received. Even so, we shall take this opportunity to reaffirm today the constitutionality of the following aspects of our capital sentencing procedure: (1) the bifurcated trial proceedings of G.S. 15A-2000, in which the same jury determines both the guilt and punishment issues, and the use of challenges for cause to excuse therefrom prospective jurors who are unequivocally opposed to the death penalty; (2) the submission of the sufficiently clear statutory aggravating circumstance of G.S. 15A-2000(e)(9), that the capital felony is "especially heinous, atrocious, or cruel," in appropriate cases; and (3) the placement of the burden upon the defendant of persuading the jury, by a preponderance of the evidence, that a

particular mitigating circumstance exists. *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, --- U.S. ---, 81 S.Ct. 6143, 72 L.Ed. 2d 155 (1982); *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980) (and cases cited in part I of the opinion, *supra*); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied*, 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed. 2d 1137 (1980); *State v. Johnson*, 298 N.C. 47, 257 S.E. 2d 597 (1979); *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979).

## XX.

The decision to take a life pursuant to the law, for the life of another, or others, wrongfully taken, is a very grave and solemn matter. Thus, this Court accords the utmost diligence and care in its review of capital cases. In the instant case, we have fully considered all of the arguments in defendant's brief, which encompassed the multitudinous assignments of error and exceptions in the record on appeal. We are convinced that both phases of defendant's trial were competently conducted without the accompaniment of constitutional defect or prejudicial error, and we so hold.

We also hold that the judgments of death were lawfully imposed. The evidence supported submission of the aggravating circumstances listed in G.S. 15A-2000(e)(9) and (11). There is no indication that the jury recommended capital punishment under the influence of passion or prejudice. Finally, the penalties imposed do not seem excessive or disproportionate considering the premeditated and callous manner in which defendant calmly shot and killed two people in cold blood, suddenly and without any provocation by them, for reasons exhibiting a wanton disregard for human life. Indeed, the record impels the conclusion that justice has been done in every respect. In sum, we have no authority or cause to disturb the duly entered judgments of death.

No error.

Justice MITCHELL did not participate in the consideration or decision of this case.

Justice EXUM dissenting as to sentence.

I.

I find myself, first, in strong disagreement with the majority on an extremely important new question dealing with the construction of our death penalty statute. The majority holds, after somewhat cursory treatment and a bare-bones analysis, that under the statute, G.S. 15A-2000, if the jury finds: (1) the existence of one or more statutory aggravating circumstances, (2) that the aggravating circumstance(s) so found are sufficiently substantial to call for the death penalty and (3) the aggravating circumstance(s) outweigh the mitigating circumstances, then the jury *must* return the death penalty. Nowhere, of course, does the statute so provide. The majority construes the statute in this way on the sole ground that otherwise the statute would be subject to the constitutional attack that a jury could decide between life and death in its unbridled discretion. Yet decisions of the United States Supreme Court, none of which are mentioned in the majority's discussion, have made it abundantly clear that the majority's interpretation is not constitutionally required.

In one of its first cases construing our death penalty statute, this Court noted, "[t]he first maxim of statutory construction is to ascertain the intent of the legislature. To do this, this Court should consider the statute as a whole, the spirit of the statute, the evils it was designed to remedy, and what the statute seeks to accomplish." *State v. Johnson*, 298 N.C. 47, 56, 257 S.E. 2d 597, 606 (1979). In *Johnson*, this Court recognized that our death penalty statute was enacted following a quintet of cases all decided by the United States Supreme Court on 2 July 1976. These cases struck down mandatory death penalty statutes in North Carolina, *Woodson v. North Carolina*, 428 U.S. 280 (1976) (plurality opinion), and Louisiana, *Roberts v. Louisiana*, 428 U.S. 325 (1976) (plurality opinion), but sustained death penalty statues which, in varying degrees, sought to control the discretion exercised in capital sentencing in Georgia, *Gregg v. Georgia*, 428 U.S. 153 (1976) (plurality opinion); Florida, *Proffitt v. Florida*, 428 U.S. 242 (1976) (plurality opinion); and Texas, *Jurek v. Texas*, 428 U.S. 262 (1976) (plurality opinion). This Court noted in *Johnson* that these five cases "made clear that neither unbridled, unguided discretion *nor the absence of all discretion* in the imposition of the death penalty is constitutionally permissible." 298 N.C. at 58, 257 S.E. 2d at 607

(emphasis supplied). After further discussion of United States Supreme Court decisions and various provisions of the Model Penal Code, upon which our statute was largely based, this Court concluded in *Johnson*, 298 N.C. at 63, 257 S.E.2d at 610:

> In summary, there are a number of controlling factors governing the interpretation of our death penalty statute. Unbridled discretion in the imposition of the sentence is not permitted. On the other hand, sentencing juries must have some discretion to determine in a rational and consistent manner those cases in which the death penalty should be imposed. Juries are to be guided in this process by a carefully defined set of statutory criteria that allow them to take into account the nature of the crime and the character of the accused. Thorough jury instructions, which incorporate and reflect the definitions accorded to these criteria and which are fully applied to the facts of each case, must be given. In each case the process must be directed toward the jury's having a full understanding of both the relevant aggravating and mitigating factors and the necessity of balancing them against each other in determining whether to impose the death penalty. Lastly, any imposition of the death penalty by the jury should be searchingly reviewed by the appellate courts to insure the absence of unfairness, arbitrariness or caprice in the result.

Regarding the question before us, the statute, G.S. 15A-2000, provides in pertinent part as follows:

> (b) Sentence Recommendation by the Jury.— . . . In all cases in which the death penalty may be authorized, the judge shall include in his instructions to the jury *that it must consider* any aggravating circumstance or circumstances or mitigating circumstance or circumstances from the lists provided in subsections (e) and (f) which may be supported by the evidence, and shall furnish to the jury a written list of issues relating to such aggravating or mitigating circumstance or circumstances.

> After hearing the evidence, argument of counsel, and instructions of the court, *the jury shall deliberate and render a sentence recommendation to the court, based upon the following matters:*

(1) Whether any sufficient aggravating circumstance or circumstances as enumerated in subsection (e) exist;

(2) Whether any sufficient mitigating circumstance or circumstances as enumerated in subsection (f), which outweigh the aggravating circumstance or circumstances found, exist; and

(3) *Based on these considerations, whether the defendant should be sentenced to death or to imprisonment in the State's prison for life.*

. . . .

(c) Findings in Support of Sentence of Death. — *When the jury recommends sentence of death,* the foreman of the jury shall sign a writing on behalf of the jury which writing shall show:

(1) The statutory aggravating circumstance or circumstances which the jury finds beyond a reasonable doubt; and

(2) That the statutory aggravating circumstance or circumstances found by the jury are sufficiently substantial to call for the imposition of the death penalty; and,

(3) That the mitigating circumstance or circumstances are insufficient to outweigh the aggravating circumstance or circumstances found.

[Emphases supplied.]

In essence, then, the statute provides that in determining whether to impose death or life imprisonment the jury "must consider" certain aggravating and mitigating circumstances; that the jury's sentence recommendation shall be "based upon" the sufficiency of the aggravating circumstance(s) and the mitigating circumstance(s) and their relative weights; and that "when the jury recommends a sentence of death," it must sign a writing in which three questions are answered affirmatively and unanimously beyond a reasonable doubt.

From this statutory scheme the legislative intent clearly emerges. The legislature has sought to strike a balance between

fairness to the individual defendant and consistency among the cases in which the death penalty is imposed. It has designed a statute which avoids the two extremes of mandatory death penalties or unbridled discretionary action by juries. The legislature intended for the jury to consider: first, the sufficiency of the aggravating circumstance(s); second, whether any mitigating circumstance(s) exist which outweigh the aggravating circumstance(s); and third, based on these considerations whether to recommend a death sentence or life imprisonment. *Only when the jury determines to recommend death* is the jury required to sign a writing which shows its affirmative, unanimous findings that one or more statutory aggravating circumstances exist beyond a reasonable doubt, that they are sufficiently substantial to make the death penalty appropriate and that the mitigating circumstances do not outweigh the aggravating circumstances.[1]. Subsection (b) states in two places that the jury's sentence recommendation is to be *based* on these considerations, not decreed by them. There is nothing in this scheme to suggest a legislative intent *to require* the jury to return a sentence of death even if it should answer the three crucial subsection (c) issues affirmatively, just as there is nothing in the statute which permits a jury to ignore the delineated considerations in its deliberations. To hold, as does the majority, that if affirmative answers in writing to these three issues are prerequisite to a jury's recommendation of death, then death *must* be recommended when the prerequisites are met is, logically, a *non sequitur*.

This logical trap is easily sprung; it caught me in my dissent in *State v. Rook*, 304 N.C. 201, 283 S.E.2d 732 (1981), *cert. denied*, --- U.S. --- (1982), where I lapsed into the same fallacy now being urged by the majority.[2] In *Rook*, however, both my dissent

---

1. Although the jury is not required by statute to answer these questions *unless* they recommend death, I believe documentation of the jury's findings in every capital sentencing proceeding, whether they recommend death or life, is necessary for this Court's use in conducting its proportionality review required under G.S. 15A-2000(d)(2).

2. In *Rook, supra,* I wrote:

Indeed, in Georgia, the jury may return a death sentence upon finding one or more aggravating circumstances, no matter how it regards the mitigating circumstances. In contrast, under our statute the jury may return a death sentence recommendation only if it finds: (1) the existence of one or more ag-

and the majority opinion were addressing a different question, *i.e.*, whether the jury was required to specify which mitigating factors it found to exist. The question now being addressed was not raised in *Rook*, and any conclusion about it was not necessary to the dissent. With the benefit of briefing, argument and my own research, I am convinced that my initial conclusion on the point here in issue, as I expressed it in *Rook*, was wrong, just as I believe the majority's similar conclusion is wrong. The conclusion is not less a *non sequitur* because I once subscribed to it.

Our trial judges initially properly construed the statute to mean that if the jury answered the three issues affirmatively it could, but was not required to, recommend the death penalty. The first Pattern Jury Instruction promulgated after the statute provided that if the jury answered the crucial issues affirmatively then it *"may* recommend the death penalty." N.C.P.I. Crim. 150.10, p. 5 (June 1977) (emphasis supplied). A subsequent revision of the instruction emphasized this point by providing that the jury *"may,* although [it] need *not,* recommend that the defendant be sentenced to death." N.C.P.I. Crim. 150.10, p. 4 (Replacement, May 1979). These instructions, or a variation of them, have been followed in a large number of death penalty cases.[3]

---

gravating circumstances; (2) that the aggravating circumstance(s) found by it are sufficiently substantial to call for the imposition of the death penalty; and (3) that *the mitigating circumstances are insufficient to outweigh the aggravating circumstances.* The clear import of our statute is that a jury, upon finding the requisite existence of aggravating circumstances and their sufficient substantiality, may not recommend life imprisonment unless it further finds that the mitigating circumstances are sufficient to outweigh the aggravating circumstances.

304 N.C. at 242-43, 283 S.E. 2d at 757 (emphasis original) (footnote omitted).

3. *See, e.g., State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981) (R. at 192, "you may recommend death"); *State v. Detter*, 298 N.C. 604, 260 S.E. 2d 567 (1979) (R. at 238, "you may recommend"); *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979) (R. at 111, "you may recommend"); *State v. Spaulding*, 298 N.C. 149, 257 S.E. 2d 391 (1979) (R. at 333, "Based upon these considerations as instructed by the Court, you will advise the court whether the defendant should be sentenced to life imprisonment or death"); *State v. Cherry*, 298 N.C. 86, 277 S.E. 2d 551 (1979), *cert. denied,* 446 U.S. 941 (1980) (R. at 341, "Based upon these considerations as instructed by the Court, you will advise the Court whether the defendant should be sentenced to life imprisonment or death"); *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979) (R. at 185, "you may then recommend the death penalty"); *State v. Jones*, 296 N.C. 495, 251 S.E. 2d 425 (1979) (R. at 276, "you may—but are not compelled to—recommend the death penalty").

After our decision in *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979), the Pattern Jury Instruction for our trial judges was changed so as to provide that if the jury answered the three issues affirmatively, it would be its "duty to recommend that defendant be sentenced to death." N.C.P.I. Crim. 150.10, pp. 3-4 (Replacement, May 1980). The case cited in support of this change in the instruction is *Goodman.*

The issue in *Goodman*, however, was not whether the jury should be told it has a "duty" to recommend the death penalty if it answers the three issues affirmatively and unanimously. The issue in *Goodman* was whether, as the defendant contended, the trial court "should have explained to the jury that it had the option of returning a recommendation of life imprisonment even if aggravating circumstances were found to outweigh mitigating circumstances." Brief for Defendant Appellant at 15-16. Defendant argued that "[i]t should be incumbent upon the trial Court to explain in detail that no mandatory recommendation of the death penalty is required regardless of findings as to aggravating and mitigating circumstances set forth in the statute." *Id.*

Thus, defendant Goodman was arguing that the trial court should be required to *explain* to the jury that it could, in effect, *ignore* the considerations which by statute it must consider in recommending a life or death sentence. This goes far beyond the

---

Other cases reviewed by this Court have contained instructions which went even further in telling the jury that the death sentence was not mandated by affirmative answers to the crucial issues. For example, in *State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183 (1981) (R. at 668), the jury was told:

Unless you have answered Issues One, Two, Four 'yes' you must recommend that a defendant in a given case be sentenced to life. Only if you have answered Issues One, Two and Four 'yes' may you recommend that a defendant be sentenced to death. Even then, though, you are not required to do so. You still may recommend life imprisonment. However, if you answered Issues One, Two and Four 'yes' you are, on further deliberations, satisfied beyond a reasonable doubt that the only just punishment for this defendant is—a given defendant in a given case, is the death penalty, then you may so recommend it; realizing, of course, the tremendous responsibility which rests on your shoulders when you make that recommendation.

*See, also, State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981) (R. at 231, "you would then further deliberate upon your sentence recommendation"); *State v. Small*, 301 N.C. 407, 272 S.E. 2d 128 (1980) (R. at 618, "Even though you are not required to do so, you may still recommend life in prison").

permissive instruction actually given and upheld in *Goodman*, *i.e.*, the instruction that if the jury answered the three subsection (c) issues affirmatively and unanimously, it "may then recommend the death penalty." (R. at 185).

The state's brief in *Goodman* recognizes that "the Court left the jury with the understanding that, even should they find more aggravating than mitigating circumstances, they could still recommend life imprisonment . . . . At no point did the Court state that the jury could not recommend life imprisonment when the aggravating circumstances outweighed the mitigating. What the Court was saying was that (even where such aggravating circumstances appeared to be more substantial than mitigating circumstances) the jury could still recommend life imprisonment." Brief for the state at 19-20.

The Court in *Goodman* answered the defendant's argument as follows, 298 N.C. at 34-35, 257 S.E.2d at 590:

His argument is that without such instruction the jury will mathematically balance the two types of factors against each other and will impose the death penalty whenever aggravating circumstances outnumber mitigating ones. We do not agree that this is the manner in which a jury will reach its decision on this important question or that the instruction for which defendant contends is required by our statute.

It must be emphasized that the deliberative process of the jury envisioned by G.S. 15A-2000 is not a mere counting process. *State v. Dixon, supra; State v. Stewart, supra.* The jury is charged with the heavy responsibility of subjectively, within the parameters set out by the statute, assessing the appropriateness of imposing the death penalty upon a particular defendant for a particular crime. *Nuances of character and circumstance cannot be weighed in a precise mathematical formula.*

At the same time, we believe that it would be improper to instruct the jury that they may, as defendant suggests, disregard the procedure outlined by the legislature and *impose the sanction of death* at their own whim. To do so would be to revert to a system pervaded by arbitrariness and caprice. The exercise of such unbridled discretion by the jury

under the court's instruction would be contrary to the rules of *Furman* and the cases which have followed it. For these reasons defendant's seventh assignment of error is overruled. [Emphases supplied.]

The majority's conclusion on this point in the instant case as well as the change in the Pattern Jury Instruction are based on a misreading of *Goodman*. *Goodman* simply recognized that, under the instructions as given, there would be no cause for the jury "mathematically" to balance the aggravating against the mitigating and "impose the death penalty whenever aggravating circumstances outnumber mitigating ones." *Goodman* cautioned that juries should not be instructed in a manner which would cause them to "impose the sanction of death at their own whim." *Goodman* does not support the proposition that a jury has a duty to impose the death penalty whenever it concludes that the statutory aggravating circumstances are sufficiently substantial to call for it and that the mitigating circumstances are insufficient to outweigh the aggravating. *Goodman* recognizes that given such determinations, a jury may yet opt for life imprisonment and notes that there is no way to escape some subjectivity in deciding who shall live and who shall die. Juries are called on in this kind of decision, we said in *Goodman*, to consider "[n]uances of character and circumstance [which] cannot be weighed in a precise mathematical formula."

It is for this reason that a jury ought not be required to return the death penalty simply because it answers the crucial subsection (c) issues affirmatively. Conscientious juries may determine that these issues ought to be answered affirmatively and yet, because of circumstances of the case, "nuances," if you will, not subject to articulation in a statute or a verdict and not perhaps articulable by the jurors themselves, feel impelled to recommend that the death penalty not be imposed.[4] We should

---

4. Indeed, juries have answered the crucial subsection (c) issues affirmatively and yet either recommended life imprisonment, *State v. King*, 301 N.C. 186, 270 S.E.2d 98 (1980); *State v. Taylor*, 298 N.C. 405, 259 S.E.2d 502 (1979); or were unable unanimously to agree on a sentence, thus requiring the judge to impose a life sentence pursuant to G.S. 15A-2000(b). *State v. Silhan*, 302 N.C. 223, 275 S.E.2d 450 (1981), on resentencing in Columbus Superior Court (Case No. 79CRS1943); *State v. Easterling*, 300 N.C. 594, 268 S.E.2d 800 (1980).

not construe our statute to require such a jury, nevertheless, to impose it.

Our statute is designed simply to insure that certain specific (subsection (c)) prerequisites are met before the death penalty is imposed. Its only prerequisites for the imposition of life imprisonment are that the jury base such a decision (subsection (b)) on a weighing against each other of various aggravating and mitigating circumstances which it may find to exist. Although the jury may not recommend death without specifically, and in writing, answering subsection (c) issues affirmatively, even if it does so it may yet recommend life.

The United States Supreme Court has made it quite clear that these kinds of death penalty or life imprisonment decisions do not result in the unbridled discretionary determinations found wanting in *Furman v. Georgia*, 408 U.S. 238 (1972)(per curiam). In *Bullington v. Missouri*, 451 U.S. 430 (1981), the Court had before it a Missouri death penalty statute very similar to ours. In *Bullington*, the Supreme Court noted that a Missouri jury "is instructed that it is not compelled to impose the death penalty, even if it decides that a sufficient aggravating circumstance or circumstances exist and that it or they are not outweighed by any mitigating circumstance or circumstances." 451 U.S. at 434-35. Although the question was not raised, there is no suggestion in *Bullington* that such a statute would be constitutionally infirm.

In *Gregg v. Georgia, supra*, 428 U.S. 153, the Supreme Court considered a Georgia death penalty statute which provided that the jury could return a sentence of death only if it found the existence of one of ten statutorily specified aggravating circumstances. The jury was not required to return a death sentence even if it found the existence of one or more of the ten statutorily specified aggravating circumstances and was "not required to find any mitigating circumstance in order to make a recommendation of mercy." *Id.* at 197. On appeal of his death sentence, defendant argued that because a Georgia jury had "the power to decline to impose the death penalty even if it finds that one or more

---

At least one jury has found ambiguity in the "Issues and Recommendation as to Punishment" form generally submitted to juries deliberating on sentences in capital cases. *State v. Lake*, 305 N.C. 143, 286 S.E.2d 541 (1981) (copy found in Case No. 80CRS5530, Onslow Superior Court).

statutory aggravating circumstances are present," the statute violated the *Furman* prohibition against unbridled discretion. *Id.* at 203. The United States Supreme Court answered by saying:

> This contention misinterprets *Furman* . . . . Moreover, it ignores the role of the Supreme Court of Georgia which reviews each death sentence to determine whether it is proportional to other sentences imposed for similar crimes. Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the penalty, *the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice.*

428 U.S. at 203 (emphasis supplied). In answering defendant's contention that there were other discretionary decisions which could be made in the processing of a murder case which would result in some candidates for the death penalty actually escaping it, the Supreme Court said:

> Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.

428 U.S. at 199. Mr. Justice White, joined by the Chief Justice and Mr. Justice Rehnquist, said in a concurring opinion in *Gregg:*

> The Georgia Legislature has plainly made an effort to guide the jury in the exercise of its discretion, while at the same time permitting the jury to dispense mercy *on the basis of factors too intangible to write into a statute,* and I cannot accept the naked assertion that the effort is bound to fail.

428 U.S. at 222 (emphasis supplied).

Finally, in *Jurek v. Texas, supra,* 428 U.S. 262, the Supreme Court considered a Texas statute which required the jury to impose the death sentence if it answered three questions affirma-

tively.[5] The attack made on the Texas statute was that it created
a mandatory death penalty in violation of the principles laid down
in *Woodson v. North Carolina, supra,* 428 U.S. 280, and *Roberts v.
Louisiana, supra,* 428 U.S. 325. The Supreme Court struggled with
this question because the Texas statute appeared to have no pro-
vision for the jury to consider mitigating circumstances. "Thus,"
the Court said, "the constitutionality of the Texas procedure
turns on whether the enumerated questions allow consideration of
particularized mitigating factors." 428 U.S. at 272. The Court con-
cluded that the jury's consideration of mitigating circumstances,
under the interpretation given the second question by the Texas
Court of Criminal Appeals, was encompassed in its decision on
that question. *See supra* note 5. Therefore, the Court concluded
that the statute was not subject to the "mandatory death
sentence" attack.

Apparently under the rationale of *Jurek,* the majority's inter-
pretation of our statute would pass constitutional muster. But I
am satisfied that the interpretation for which I argue is more
solidly supported in the decisions of the United States Supreme
Court; whereas the majority's view, which could be supported
only by *Jurek,* is at least constitutionally suspect.

Assuming that we are free under the United States Constitu-
tion to opt for either interpretation, we should adopt the one
which most nearly comports with the legislature's intent as that
intent is revealed in the plain words of the statute. The
legislature has developed a statutory scheme designed to accom-
modate the twin "goals of measured, consistent application and
fairness to the accused." *Eddings v. Oklahoma,* --- U.S. ---, ---,
102 S.Ct. 869, 874, 71 L.Ed.2d 1, 8 (1982). In *Goodman, supra,* 298

5. The questions are these:

(1) whether the conduct of the defendant that caused the death of the de-
ceased was committed deliberately and with the reasonable expectation that
the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal
acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing
the deceased was unreasonable in response to the provocation, if any, by the
deceased.

*See* 428 U.S. at 269 (quoting Tex. Code Crim. Proc., art. 37.071(b) (Supp. 1975-76)).

N.C. 1, 257 S.E. 2d 569, we held that instructions which, in effect, explained to the jury that it could ignore the procedure devised by the legislature were not authorized by our statute and would be contrary to the *Furman* standards. Likewise, instructions that tell the jury they *must* impose the death penalty if they answer certain questions affirmatively and unanimously are not authorized by our statute and fail to give appropriate weight to inarticulable, intangible "[n]uances of character and circumstances." *State v. Goodman, supra,* 298 N.C. at 34, 257 S.E. 2d at 590.

Our statute, like the Supreme Court said of its decision in *Lockett,*[6] "is the product of a considerable history reflecting the law's effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual." *Eddings v. Oklahoma, supra,* --- U.S. at ---, 102 S.Ct. at 874, 71 L.Ed. 2d at 8. Both the instructions disapproved in *Goodman* and those given in the instant case upset the statute's finely tuned balance between consistency and sensibility to the uniqueness of an individual. The instruction sought by the defendant in *Goodman* tilts too much in favor of individualized consideration at the expense of consistency; whereas the instruction given here tilts too much in favor of consistency at the expense of individualized consideration.

The instruction most in keeping with the legislative design and which ought to be given in all cases is that recommended by the Superior Court Judges' Pattern Jury Instruction Committee in May 1979. In that instruction jury members are told that if they answer the crucial issues affirmatively and unanimously, "you may, although you need not, recommend that the defendant be sentenced to death." N.C.P.I. Crim. 150.10 at 4.

## II.

At least two jurors were excluded for cause in the instant case in violation of the limitations imposed by *Witherspoon v. Illinois,* 391 U.S. 510 (1968), an opinion by Mr. Justice Stewart. Some particularly pertinent language of this landmark case bears repeating, 391 U.S. at 519-23:

> A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he

---

6. *Lockett v. Ohio,* 438 U.S. 586, 604 (1978) (plurality opinion).

takes as a juror. But a jury from which all such men have
been excluded cannot perform the task demanded of it . . . .
[A] jury that must choose between life imprisonment and
capital punishment can do little more—and must do nothing
less—than express the conscience of the community on the
ultimate question of life or death . . . . [A] jury composed ex-
clusively of . . . people [who believe in the death penalty]
cannot speak for the community. Culled of all who harbor
doubts about the wisdom of capital punishment—of all who
would be reluctant to pronounce the extreme penalty—such a
jury can speak only for [those who believe in the death penal-
ty].

If the State had *excluded only those prospective jurors
who stated in advance of trial that they would not even con-
sider returning a verdict of death*, it could argue that the
resulting jury was simply 'neutral' with respect to penalty.
But when it swept from the jury all who expressed conscien-
tious or religious scruples against capital punishment and all
who opposed it in principle, the State crossed the line of
neutrality. In its quest for a jury capable of imposing the
death penalty, the State produced a jury uncommonly willing
to condemn a man to die.

        . . . .

Specifically, we hold that a sentence of death cannot be car-
ried out if the jury that imposed or recommended it was
chosen by excluding veniremen for cause simply because they
voiced general objections to the death penalty or expressed
conscientious or religious scruples against its infliction. No
defendant can constitutionally be put to death at the hands of
a tribunal so selected.

        . . . .

To execute [such a] death sentence would deprive him of his
life without due process of law. [Footnotes omitted.] [Em-
phasis supplied. ]

Furthermore, *id.* at 522-23 n. 21,

a prospective juror cannot be expected *to say in advance of
trial whether he would in fact vote for the extreme penalty*

in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the *voir dire* testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out . . . .

We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* [Emphasis original.]

The test applicable to this case then, under *Witherspoon,* for excuses for cause on death penalty opposition grounds is that the prospective juror must make it "unmistakably clear" that he or she would "automatically" vote against the death penalty "without regard to any evidence that might be developed at the trial of the case." A juror who has scruples, or reservations, or who is even opposed to capital punishment, but who is not "irrevocably committed, before the trial has begun, to vote against [it] regardless of the facts and circumstances" that might be brought out at trial, may not be excused for cause. Neither may a juror who states merely that he or she has " 'a fixed opinion against' capital punishment " or that he or she does not " 'believe in' capital punishment" be excused for cause, because such juror may yet "be perfectly able as a juror to abide by existing law — to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case." *Boulden v. Holman,* 394 U.S. 478, 483-84 (1969). Jurors may be excused for cause, however, if their opposition to the death penalty is so strong that they cannot take an oath to "follow the law" in trying the case. *Lockett v. Ohio,* 438 U.S. 586, 595-96 (1978) (plurality opinion).

The United States Supreme Court's latest decision applying *Witherspoon* is *Adams v. Texas*, 448 U.S. 38 (1980). In *Adams* the Court made it clear that *Witherspoon* must be followed even under post-*Furman* guided discretion capital sentencing procedures. *Adams* held that because of *Witherspoon* limitations jurors may not be excused for cause on the ground that their opposition to the death penalty might "affect" their deliberations on issues of fact which might arise in the case.[7] The Court said, 448 U.S. at 46-47:

> [A] Texas juror's views about the death penalty might influence the manner in which he performs his role but without exceeding the 'guided jury discretion,' 577 SW2d, at 730, permitted him under Texas law. In such circumstances, he could not be excluded consistently with *Witherspoon*.

It said, further, 448 U.S. at 49-50, that jurors were improperly excluded

> who stated that they would be 'affected' by the possibility of the death penalty, but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally. Others were excluded only because they were unable positively to state whether or not their deliberations would in any way be 'affected.' But neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty. The grounds for excluding these jurors were consequently insufficient under the Sixth and Fourteenth Amendments. Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a

---

7. *See supra* note 5 and accompanying text.

reasonable doubt. Such assessments and judgments by jurors are inherent in the jury system, and to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law.

If only one juror is excused for cause, in violation of *Witherspoon* limitations, a sentence of death cannot stand. *Davis v. Georgia*, 429 U.S. 122 (1976)(per curiam). The *Davis* Court noted, 429 U.S. at 123:

Unless a venireman is 'irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings,' 391 US, at 522 n 21, he cannot be excluded; if a venireman is improperly excluded even though not so committed, any subsequently imposed death penalty cannot stand.

This Court held in *State v. Bernard*, 288 N.C. 321, 325, 218 S.E.2d 327, 330 (1975), that a juror could not be excused merely because "he *thought* he would automatically vote against the imposition of the death penalty regardless of the evidence." (Emphasis original.)

Finally, the meaning of the voir dire colloquy is that which would be given it by the prospective juror rather than one trained in the law. "The critical question, of course, is not how the phrases employed in this area have been construed by courts and commentators. What matters is how they might be understood — or misunderstood — by prospective jurors." *Witherspoon v. Illinois, supra*, 391 U.S. at 515-16 n. 9 (quoted with approval in *Boulden v. Holman, supra*, 394 U.S. at 481-82).

Turning now to the challenges for cause here under attack, I am satisfied that prospective juror Mary Neal was excused for cause on broader grounds than *Witherspoon* permits. Neal, after an extended colloquy with the prosecutor, never expressed any categorical opposition to the death penalty. She simply said that she would have to be absolutely certain of a defendant's guilt before she could vote to impose it. That portion of the colloquy which accurately reflects her attitude is the following:

Q. Do you have any objection to the death penalty?

A. Well, that's a hard question to answer.

Q. Yes, ma'am.

A. I've never been able to answer it like a cut dried thing. It's hard for me, very hard for me to make decisions, I've never been able to make decisions very well. I had someone to help me, but I'm hard to convince too. I almost have to see something before I could really say so. That's the only way I know to answer you.

. . . .

Q. Let me ask that question a different way, Mrs. Neal, if you're a member of this jury and we get to the second part of the trial, that means you've already found him guilty of murder in the first degree in one or both cases, based on the evidence in this case, what happened in this case and based on the law that Judge Walker gives to you, as he tells you the law, if you deem it to be appropriate, could you impose the death penalty?

A. I don't think so, I really don't believe so.

Q. I understand this is a tough area, but we have to inquire about this now and everyone is entitled to their own opinion. Are you saying, ma'am, that you could not and you would not vote to impose the death penalty in this case, regardless of the evidence?

A. I don't know. I guess if it was proven to me, I guess I could.

Q. If what was proven to you?

A. I would have to be — I would have to absolute know for sure, I mean no doubt whatsoever.

. . . .

Q. As a juror, can you envision a situation where you would impose the death penalty, you're not going to be an eyewitness, you're going to have to act on what other people tell you they saw or heard.

A. Okay, already proven guilty—if I went along with the guilty part, if I decided they were guilty—no, I will not.

Q. You could not impose the death penalty regardless of what the evidence is?

A. I don't believe so.

MR. WANNAMAKER: If your Honor please, we challenge for cause.

THE COURT: I understand, Mrs. Neal. I know this is very difficult for you, but it's necessary to have your candid and frank answers and I thank you for them.

Do I understand that you could not even before you hear the testimony under any circumstances, impose the death penalty?

MARY D. NEAL: No, I just don't think so.

At most, Neal's attitude toward the death penalty "affected" her deliberations on the guilt phase of the case in the sense that she would have to be absolutely certain of defendant's guilt. "[P]rospects of the death penalty may affect what [a juror's] honest judgment of the facts will be or what [a juror] may deem to be a reasonable doubt," *Adams v. Texas, supra,* 448 U.S. at 50, without the juror's subjection on that ground to a challenge for cause. Neal never "unmistakably" said that she would not impose the death penalty, or that she would "automatically" vote for life imprisonment, regardless of what the evidence might show. She said she didn't "believe" and didn't "think" she could vote for death. She never said, absolutely, that she could or would not. She should not have been excused for cause.

Prospective juror Frank Rogers said, "I don't go for [the death penalty] too much" and "I don't think much of the death penalty." He never said he was categorically opposed to the death penalty. When asked whether he could consider imposing the death penalty, the following occurred:

A. I can consider, but as I say—

Q. You tell me you would consider it but then you wouldn't do it, is that what you are saying?

MR. HARRISON: Objection.

A. (By witness) I said I would lean toward life imprison-
ment, if you want me to tell the truth about it, that's what
I'm doing.

At that point, the court intervened as follows:

THE COURT: Mr. Juror, are you saying that before you
have heard any evidence in this case, Mr. Rogers, if the
defendant should be found guilty of either charge of murder
in the first degree, without hearing any evidence, that under
no circumstances would you return a verdict which would
result in the imposition of the death penalty?

MR. ROGERS: That is true.

Thus Rogers did not say that he could or would not impose the
death penalty or that he would automatically vote for life im-
prisonment, regardless of evidence *that might be introduced at
the trial.* He said he could not impose it under any circumstances
"without hearing any evidence." Obviously, the learned trial
judge was attempting to ask Rogers whether he could impose it
under any circumstances regardless of what evidence adduced at
trial might show, and to one trained in the law that is what the
court's question might mean. To Rogers, a layman, the question
could mean no more than what the words actually used by the
trial judge would ordinarily convey. Roger's position, then, was
simply that he could not impose the death penalty until he at
least had heard some evidence in the case. The thrust of the en-
tire colloquy seems to be that, depending on what the evidence
adduced tended to show, Rogers could consider the death penalty,
that he tended to favor life imprisonment, but that he would not
convince himself one way or the other without hearing some
evidence. Rogers should not have been excused for cause.

## III.

The majority concludes that the trial court did not err in
refusing to submit both in his instructions and on the written list
defendant's "relatively low mentality" as a mitigating cir-
cumstance because there was no evidence to support it and, even
if there had been supporting evidence, the error could not have
been prejudicial. As the majority correctly notes, a defendant's

low mentality, if it exists, is "properly considered in mitigation of a capital felony."

I cannot agree with the majority that the evidence does not support defendant's "relatively low mentality" mitigating circumstance. Defendant's psychiatric witness, Dr. Billy Royal, testified that defendant scored 66 on an intelligence test; but, he said, "[w]e felt that his other tests indicated that his I.Q. was probably a little higher than that and fell at least into the low-normal range of intelligence." Apparently the majority concludes that any intelligence quotient which is within a "normal range" cannot be considered by a jury in a capital case unless it is proffered by the defendant as an absolute score on an intelligence test. The majority concludes that if it is proffered under the label "relatively low mentality," rather than as a raw score, it may not be considered.

I simply cannot subscribe to, nor do I really understand, the distinction drawn by the majority. Any kind of absolute score on an intelligence test, in order to be meaningful to a lay jury or for that matter to lawyers and judges, needs explanation by competent expert testimony. The testimony in this case was that defendant's intelligence was in the "low-normal range." Defendant asked that his "*relatively* low mentality" be submitted as a mitigating circumstance. The evidence supports that he did have a "*relatively* low mentality." It should be for the jury to assess this quality in terms of its mitigating effect. It is not for the court to say that the jury could not, as a matter of law, consider a person's "relatively low mentality" as a mitigating circumstance because the mentality is within the outer limits of "normal." To me, the phrase "relatively low mentality" accords precisely with the evidence which was introduced. A person whose intelligence is in the low-normal range must perforce have a relatively low mentality. Contrary to the majority's conclusion, the terms are synonymous.

Neither on this record am I able to say that not permitting the jury to consider this mitigating circumstance was harmless beyond a reasonable doubt. Not to permit a jury to consider any relevant mitigating circumstance is an error of constitutional dimension. *Eddings v. Oklahoma, supra,* --- U.S. ---, 102 S.Ct. 869, 71 L.Ed.2d 1; *Lockett v. Ohio, supra,* 438 U.S. 586. Before we

can deem such an error harmless, we must be satisfied "that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967); G.S. 15A-1443(b). The burden is upon the state to so demonstrate. *Id.*

Of the ten mitigating circumstances submitted, we know from the record only that the jury found "one or more." We do not know how many beyond one it found. It is possible that the jury found only one mitigating circumstance to exist out of the list of ten. If it did, the failure to submit an additional mitigating circumstance which should have been submitted and which the jury could have found to exist might well have made a difference in the jury's ultimate recommendation. At least I cannot say beyond a reasonable doubt that it would not have made a difference.

The United States Supreme Court has recently recognized that a youthful defendant's mental development is a significant mitigating circumstance. *Eddings v. Oklahoma, supra*, was a capital case in which, under Oklahoma procedure, the sentencing decision was made by the trial judge. The judge, after hearing evidence, found all of three alleged aggravating circumstances to exist beyond a reasonable doubt. He also found that the youth of the defendant (age sixteen) was a mitigating circumstance "of great weight." The trial judge, however, did not believe he could consider "*the fact of this young man's violent background.*" *Id.* at ---, 102 S.Ct. at 873, 71 L.Ed. 2d at 7 (emphasis original). For failure of the trial judge to consider this additional mitigating circumstance, the United States Supreme Court set aside the death penalty and remanded for further proceedings. The Court said, *id.* at ---, 102 S.Ct. at 877, 71 L.Ed. 2d at 12:

> [J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background *and mental* and emotional *development* of a youthful defendant be duly considered in sentencing. [Emphases supplied.]

In the case at bar the trial judge's refusal to submit and instruct on defendant's "relatively low mentality" as a mitigating circumstance deprived the defendant of his right to have the jury consider his "mental . . . development." The error was not cured by submitting to the jury the catchall language of the tenth mitigating circumstance when it was unaccompanied by any

specific instruction relating to the particular circumstance of defendant's low mentality.

For the foregoing reasons, I vote to vacate the death sentence imposed in this case and to remand for a new sentencing hearing. I concur in the majority's conclusion that there was no prejudicial error in the guilt phase of the case.

## IV.

This is yet another in a growing number of cases in which a majority of the Court has affirmed the death penalty and in conducting its statutorily mandated "proportionality review" of the death sentence has failed to advise the bar of the manner in which it conducts such a review. The majority, unlike courts in other jurisdictions which have statutes similar to ours, has yet to tell the bar whether its review is based on comparisons with those cases in which the death sentence was imposed at trial and affirmed on appeal, or with those cases in which the jury could have recommended the death penalty but instead recommended life imprisonment and which have been reviewed on appeal, or with cases from some other kind of pool. It is time for the majority to declare itself on this important question, and I urge it to use as a pool for comparison purposes all cases tried under the new death penalty statute, whether the jury recommended death or life imprisonment and which have been reviewed on appeal by this Court.

The statute, G.S. 15-2000(d)(2), requires us to impose a life sentence if we find that a death sentence imposed by the trial court "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." This language is identical to language in Georgia's death penalty statute. See Ga. Code Annot. § 27-2537(c)(3) (1978). The Georgia Supreme Court looks to all appealed murder cases, whatever the sentence imposed, in making its comparisons. *Ross v. State*, 233 Ga. 361, 365-66, 211 S.E. 2d 356, 359 (1974), *cert. denied*, 428 U.S. 910 (1976).[8] In sustaining the Georgia death penalty statute, the

___

8. The Georgia Supreme Court also noted "that nothing in the statute forecloses this court during the course of its independent review from examining non-appealed cases and cases in which the defendant pleaded guilty to a lesser offense." *Ross v. State, supra*, 233 Ga. at 366, 211 S.E. 2d at 359.

State v. Pinch

United States Supreme Court relied on the Georgia Supreme Court's proportionality review safeguard. Of it, the United States Supreme Court said in *Gregg v. Georgia, supra*, 428 U.S. at 206:

> In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. *If a time comes when juries generally do not impose the death sentence in a certain kind of murder case*, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death. [Emphasis supplied.]

The Florida Supreme Court in conducting its proportionality review also compares all appealed murder cases, including those where a sentence less than death was imposed. It has concluded that ignoring life sentences imposed in factually similar cases would make its review procedure constitutionally defective. *McCaskill v. State*, 344 So. 2d 1276 (Fla. 1977) (per curiam).

The plain words of our statute require that we compare the case before us not only with similar cases in which the death penalty has been imposed but with similar cases in which the jury was permitted to consider it but decided instead to recommend life imprisonment. The basic purpose of proportionality review is to make sure that the death sentence in the case before us is not "excessive" to sentences "imposed in similar cases." If we look for comparison only to cases in which the death penalty has been imposed, the sentence in the case under review could never be excessive because one death sentence never "exceeds" another. It is only by comparing the case being reviewed in which a death sentence was imposed with other similar cases in which life was imposed that we can determine whether the death penalty in the case being reviewed is really excessive to the penalty being imposed in similar caes. For, to reiterate what the Supreme Court said in *Gregg v. Georgia, supra*, if there are certain kinds of murder cases in which our juries are generally not recommending death, then an occasional death sentence imposed in those kinds of cases ought to be set aside by this Court.[9]

9. In my dissenting opinion in *State v. Rook, supra*, 304 N.C. at 245-46, 283 S.E. 2d at 758-59, I pointed out that rarely do juries in this state impose the death penalty in cases where a defendant was found to have been under the influence of a mental or emotional disturbance or whose capacity to appreciate the criminality of

We ought not limit ourselves only to cases where the death sentence was imposed and affirmed. To do so means that we only ask whether the case under review is as bad as the other death cases. The legislature intended us not only to make that determination but also to determine whether the case under review is more deserving of the death penalty than similar cases in which life sentences have been imposed. The statute's plain language requires that we make both kinds of comparisons. Of the two, the latter is the more meaningful and is probably constitutionally required.

Further, by using only other death sentence cases affirmed on appeal, the Court severely limits the pool of cases available for comparison. Since the effective date of our capital punishment statute, 7 June 1977, there have been only six such cases. *See State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761 (1981); *State v. Rook, supra,* 304 N.C. 201, 283 S.E. 2d 732; *State v. Hutchins, supra,* 303 N.C. 321, 279 S.E. 2d 788; *State v. Martin,* 303 N.C. 246, 278 S.E. 2d 214, *cert. denied,* --- U.S. ---, 102 S.Ct. 431, 70 L.Ed. 2d 240 (1981); *State v. McDowell,* 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied,* 450 U.S. 1025 (1981); *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907 (1980). The statute requires that we compare factually "similar" cases. Similar cases for comparison purposes are simply not present in such a small sampling. The Court should want to expand, rather than restrict, the pool of cases so that truly similar cases will be more quickly available and we can begin to make the comparisons which the statute requires.

The bar is entitled to know upon what basis we are conducting the proportionality review mandated by the statute. Defendant Pinch has expressly and reasonably requested that we provide this knowledge. We should grant the request. We should not continue to keep the manner in which we perform this duty shrouded in mystery.

---

his conduct or to conform his conduct to law was impaired. I suggested that this Court should be slow to affirm death penalties in which either of these mitigating circumstances was found to exist because the penalty might well be excessive to the penalty imposed generally by juries in these kinds of cases.

Justice CARLTON concurring.

I concur with the majority opinion. However, I wish to add that I agree with the views expressed by Justice Exum in section IV. of his dissenting opinion. In my opinion, the comparison pool for proportionality review for first degree murder cases should include all cases tried under the present death penalty statute which have been affirmed on appeal by this Court, regardless of the punishment imposed. I think it is time for this Court to address this issue.

Chief Justice BRANCH joins in this concurring opinion.